## STATE *v.* D'ONOFRIO

[No. 125, September Term, 1959.]

*Decided November 23, 1959.*
*Petition to stay issuance of mandate filed December 4, 1959,*

22

*granted December 17, 1959, and mandate stayed thirty days from December 23, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Frank H. Newell, III, State's Attorney for Baltimore County,* and *James H. Norris, Jr., Special Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for appellant.

*Bernard J. Flynn* and *Robert J. Romadka,* for appellee.

HENDERSON, J., delivered the opinion of the Court.

On June 1, 1956, the appellee, along with two co-defendants, was tried and convicted of robbery with a dangerous and deadly weapon by Judge Smith sitting without a jury in the Circuit Court for Baltimore County, and sentenced to twelve years imprisonment. The co-defendants received sentences of eight and twelve years, respectively. All of them were represented by competent counsel. On November 24, 1958, the appellee filed a petition under the Post Conviction Procedure Act, which was answered by the State's Attorney on December 5, 1958. After a hearing on December 16, 1958, before Judge Gontrum, the judgment, verdict and sentence were ordered stricken and the petitioner released from custody. The State filed an application for leave to appeal, which was granted by this Court, and the case advanced for argument.

The appellee's first contention is that the application for leave to appeal was not in time, and the matter is not properly before us. It appears that on January 13, 1959, the

State's Attorney for Baltimore County filed with the Clerk of the Circuit Court an application for leave to appeal, which remained in the Clerk's office until May 22, 1959, when it was forwarded to this Court. Code (1959 Supp.) Art. 27, sec. 645-I, provides that any person aggrieved, including the State "may within thirty (30) days after the passage of [an order under the Act] * * *, apply to the Court of Appeals of Maryland for leave to prosecute an appeal therefrom. Said application for leave to prosecute an appeal shall be in such form as the Court of Appeals may, by its rules, prescribe". This Act took effect June 1, 1958. On July 2, 1958, this Court amended Rule 811 a, to provide that an application for leave to appeal in a post conviction case "may be filed either with the Clerk of this Court or with the clerk of the lower court to be transmitted forthwith by him, with the record of the post conviction proceeding, to this Court." See also Rule 893. The appellee also refers to the fact that certain sections of the Act (but not sec. 645-I) were amended by chapter 429, Acts of 1959, effective June 1, 1959, although the relevance of this is not apparent. The argument seems to be that sec. 645-I requires an application to be made to the Court of Appeals and lodged there within thirty days, and that Rule 811 a does not purport to change the requirement that the application reach this Court within the period prescribed. If there is any substance to the claim, and we do not so decide, it is clear in this record that the State's Attorney not only filed the application in the lower court, but also on January 14, 1959, sent a copy of the application to the Clerk of this Court, which was received on January 15, 1959, within thirty days from the date of the challenged order. Thus, on any theory, the case is properly before us.

The appellee also contends that the transcript of testimony of the trial of the appellee in 1956 is not properly before us. It is true that this transcript was not offered in evidence at the post conviction hearing, but that hearing was conducted in a most unusual manner. Judge Smith had retired from the bench at the time of the hearing, but he nevertheless, by invitation of Judge Gontrum, and without objection by either side, sat with Judge Gontrum at the hearing and conferred with

him in chambers. In his first oral opinion Judge Gontrum referred to his consultation with former Judge Smith, and stated "If I had been sitting in this case when it was heard by Judge Smith, I would have unquestionably found D'Onofrio guilty; there would have been no alternative. The only possible verdict was 'guilty'." It is difficult to see how the court could make such a statement, without an examination of the transcript, unless the court relied upon a summary of the testimony supplied from the recollection of former Judge Smith. Judge Gontrum, of course, did not sit in the trial in 1956. The court continued: "It is true that the defendant D'Onofrio was not convicted on the testimony of the co-defendants. His presence at the scene of the holdup and his actions at that time certainly indicated beyond a reasonable doubt that he was a party to the crime. However, the repudiation of the testimony given at the trial by Burroughs and Burke casts sufficient doubt upon D'Onofrio's guilt to justify the court in setting aside the original verdict of guilty. I feel that unquestionably a mistake was made by reason of the perjury of the two co-defendants and that in the interest of justice D'Onofrio should be free. Judge Smith is of the same opinion and states he would not have convicted D'Onofrio if the other two defendants had testified at the hearing before him as they now admit to be the truth."

Judge Gontrum also stated that he was impressed, and "Judge Smith must be also", with the opinion of Father Tobey, the Prison Chaplain, expressed in court, that "Burroughs is now telling the truth and that D'Onofrio is also telling the truth, his words have great weight with the court." Four days later, in a supplementary statement, Judge Gontrum stated that "D'Onofrio is not so much the injured innocent * * *. He is the only one of the trio * * * who had a criminal record. * * * His actions at the time of the holdup were such as to justify a conclusion that he was guilty beyond a reasonable doubt and to a moral certainty. * * * It is only because the court feels that there is now a reasonable doubt raised by the subsequent testimony of Burroughs, the statement of Burke and the convincing testimony of Father Tobey that the court has arrived at the opinion that D'Onofrio's

fantastic tale is a true one. * * * I believe he was not guilty of the offense charged against him."

Subsequent to the filing of the application for appeal, the State, over objection by the appellee, sought to include the original transcript in the record. The appellee filed a motion to strike which came on for hearing. On May 20, 1959, Judge Gontrum filed a lengthy memorandum, reviewing the whole case, in which he noted that the State had offered no testimony at the post conviction hearing, and "the court was left under the definite impression that the State had no objections to the granting of the relief prayed. * * * With the advantage of having former Judge Smith confer with me in the hearing on the petition, I felt that I was, to quite an extent, in the position of the court sitting as a jury which had heard the original case. I was not informed by the State's Attorney that the testimony of Burroughs and Burke was not a part of the State's case, nor did I ask Judge Smith concerning it * * *." The court continued: "* * * it would seem that the transcript of the testimony in the original case is not a part of the record in this appeal. However, in order that the Court of Appeals may have the whole record before it, I have ordered that a transcript of the original hearing be filed in the record * * *. In conclusion, after having familiarized myself with the record of the original suit when the matter was brought up some weeks subsequent to the hearing, I am still of the opinion that D'Onofrio's strange tale is true, and that to confine him longer in prison would be a miscarriage of justice. For that reason I have released him on bail, pending an appeal * * *."

It is well settled, of course, that a record cannot be amplified by the introduction of new matter or proceedings taken in the trial court subsequent to a hearing, with possible exceptions in connection with divorce proceedings or where there is a claim that the case has become moot. Under the very unusual circumstances of the instant case, however, we are disposed to consider the transcript of the original proceedings for several reasons. In the first place, it seems clear that the court's action, appealed from, was predicated upon a misconception of what actually occurred in the original trial,

and probably upon a misconception as to the court's proper function in a post conviction hearing. In such a hearing the question is the legality of the detention or sentence, not the determination of guilt or innocence in a trial *de novo*. If the sentence is to be set aside, rather than corrected, the accused would ordinarily be entitled to a new trial, not to an unconditional release. Moreover, to a considerable extent, the court's opinion seems to have been formed, not on the basis of facts in the record, but upon the opinions of former Judge Smith and Father Tobey on the ultimate questions of guilt or veracity, that were for the court alone to decide, insofar as relevant at all to the inquiry before the court. Judge Smith was invited to sit as a friend of the court "to advise with me concerning the disposition of the case", at a time when he was no longer a judge. Under sec. 645G of Art. 27, Code (1959 Supp.), it is provided that the judge sitting at the original trial shall not sit, except with the consent of the person convicted. Of course, a former judge is not qualified to sit in judgment and decide a case, even with the consent of both sides.

We think these irregularities, without more, might support a remand of the case for further consideration by the trial court. We do not accept the appellee's suggestion that, in the absence of the transcript of the original trial, there is nothing before us to review. The appellant has produced enough, in the opinions of the trial court and other papers in the case, aside from the transcript in question, to show probable error, and we find nothing to indicate such a waiver by the State as to foreclose its right to review. However, it is clear that the trial court did, in the end, read and consider the transcript which was included in the record, and reaffirmed its earlier action. In effect, the trial court granted a rehearing and came up with the same result. We think a remand would serve no useful purpose. The case has been fully presented, and we are disposed to consider the transcript as properly before us, under the peculiar circumstances of this case.

The problem presented is that of the recanting witness. Burroughs, Burke and D'Onofrio were jointly indicted and

tried together and all waived a jury trial. They came in a two-tone 1950 Ford belonging to Burroughs to a filling station at about 3:40 A. M. on May 17, 1956. Burroughs held up the attendant with a .45 calibre pistol, took him into a back room, where the attendant, Wilson, handed over $181.95 from the cash drawer. D'Onofrio followed them into the back room, and tried to "hurry Burroughs up." Burke, who was twenty years old and quite intoxicated, remained in the car. Wilson identified Burroughs and D'Onofrio later that morning, in a police line-up. He identified them in court. A police officer, Lichtel, testified he arrested D'Onofrio, and the others, in the vehicle described in the police broadcast, at about 3:50 A. M. They found the pistol and considerable money in the trunk of the car, and the balance of the money on Burroughs. Some of it was in rolls of coin. Burke and Burroughs gave statements to the police, D'Onofrio did not. D'Onofrio took the stand and admitted following Burroughs into the station back room, and urging him to "hurry up". He claimed he was scared. He did not participate willingly. The robbery was Burroughs' idea. Burroughs had stopped twice before, at a lunch room and another filling station with robbery as the object, but D'Onofrio "discouraged" him. He had had a fight with Burroughs and Burke a few days before. On this night they had "made up" and had been drinking together. Burroughs showed him the gun, at one time gave it to him with the clip removed. He gave it back. D'Onofrio was thirty-eight years old and had had numerous convictions for disorderly conduct and assault. The others had no criminal records.

At the post conviction hearing D'Onofrio told virtually the same story he had told at his trial. Burroughs testified that at the first trial he had given a statement which "implicated" D'Onofrio in the holdup, he didn't remember the words he used but believed he said D'Onofrio mentioned having a weapon and mentioned a holdup that night. His reason for implicating D'Onofrio was because he was angry with him. The remarkable thing about the testimony which Burroughs recanted was that it was not offered by the State, was apparently not necessary to the conviction, and was certainly

not known to the State to be false (if, indeed, it was). All three defendants took the stand in their own defense. Burroughs testified in his own defense that D'Onofrio knew that he (Burroughs) was looking for a good place to hold up, knew that he had the gun and followed him into the back room. His recantation did not deny these facts, and it is difficult to see how it could be found to have exonerated D'Onofrio from his admitted participation. The trial court, Judge Smith, in his opinion filed in the original case, simply did not believe D'Onofrio's story that he was in some way coerced into his admitted participation, or was under the domination of the others. He pointed out that D'Onofrio had abundant opportunity to disassociate himself with the enterprise, but did not do so. It may well be questioned whether the recantation of a fragment of testimony upon which the State did not rely, and which was admitted only as against other defendants, and without objection, could be the basis of relief in any event.

The State rests its case, however, on the proposition that, even assuming that the testimony recanted was material to the issue, it does not afford ground for relief under the Act. Code (1959 Supp.), Art. 27, sec. 645A (a) provides that any person convicted of a crime and incarcerated under sentence of imprisonment "who claims that the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of this State, or that the court * * * was without jurisdiction to impose the sentence, or that the sentence exceeds the maximum authorized by law, or that the sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy, may institute a proceeding under this subtitle to set aside or correct the sentence, provided the alleged error has not been previously and finally litigated or waived in the proceedings resulting in the conviction, or in any other proceeding that the petitioner has taken to secure relief from his conviction." Sec. 645A (b) provides that "The remedy herein provided is not a substitute for, nor does it affect any remedies which are incident to the

proceedings in the trial court * * * or any remedy of direct review of the sentence or conviction. * * *."

These provisions are virtually identical with those of the Uniform Acts, Post-Conviction Procedure Act, 9B U.L.A., sec. 1. In a comment by the Commissioners who prepared the Uniform Acts, it was noted: "The aim of this section is to bring together and consolidate into one simple statute all the remedies, beyond those that are incident to the usual procedures of trial and review, which are at present available for challenging the validity of a sentence of imprisonment. * * * [It] is aimed to incorporate and protect all rights presently available under habeas corpus, coram nobis, or other remedies. The change is a procedural one." We think it is perfectly clear that the Act does not create any new substantive rights or remedies, that were not available prior to its enactment.

The problem of a recanting witness is not a new one in Maryland. We have repeatedly held that a contention that a conviction was based on perjured testimony may not be raised on habeas corpus, in the absence of allegations that a State officer had a part in procuring the testimony or, at the time of trial, knew it to be perjured. *Myers v. Warden,* 218 Md. 633; *Jones v. Warden,* 214 Md. 656; *Height v. Director,* 209 Md. 647, 650; *Whitley v. Warden,* 209 Md. 629, cert. den. 351 U. S. 929; *Rountree v. Wright,* 189 Md. 292. The Supreme Court has held that a right to procedural due process is violated, if it be shown that State officials knowingly colluded in the production of perjured testimony, or allows it to go uncorrected when it appears. See *Napue v. Illinois,* 360 U. S. 264; *Alcorta v. Texas,* 355 U. S. 28; *White v. Ragen,* 324 U. S. 760; *Hysler v. Florida,* 315 U. S. 411; *Mooney v. Holohan,* 294 U. S. 103. The cases seem to recognize, at least where State procedure is under review, that no Constitutional question is presented in the absence of a showing of State knowledge or participation. (Cf. *Matter of Morhous v. N. Y. Supreme Court,* 293 N. Y. 131, and *People v. Wakat,* 114 N. E. 2d 706, 710 (Ill.).) Unlike the situation in some other States, Maryland has long recognized that the writ of habeas corpus is broad enough to permit

consideration of claims of denial of procedural due process. See Markell, *Review of Criminal Cases in Maryland by Habeas Corpus and by Appeal,* 101 U. Pa. L. Rev., 1154. There is no such claim in the instant case. There is no suggestion that any witness recanted until long after the original trial and sentence.

Nor is relief available under the writ of *coram nobis. Keane v. State,* 164 Md. 685, is directly in point. In *Madison v. State,* 205 Md. 425, relief was denied upon motion to strike the judgment, but this Court also denied relief, treating the motion as an application for *coram nobis.* See also *Johnson v. State,* 215 Md. 333. In some States *coram nobis* has been given a wider scope than in Maryland, to permit a new trial on a showing of conditions tantamount to a denial of due process. *Harris v. Commonwealth,* 296 S. W. 2d 700, 702 (Ky.). See also Frank, *Coram Nobis* § 3.01 [b]. But even there, the mere recantation of material testimony is not enough to require relief. We know of no other common law or statutory remedy that would afford relief because of recantation by a witness, without proof of State collusion in the alleged perjury. As pointed out in the *Keane* case, *supra,* it might well be impossible to determine which version was correct, and the only relief would seem to be through the parole authorities.

*Order reversed, and petition dismissed.*