REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 146

September Term, 2011

TRACEY HAWES

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Meredith,
Kenney, James A., III
    (Retired, Specially Assigned),

        JJ.

Opinion by Eyler, Deborah S., J.

Filed: February 25, 2014

In 1994, in the Circuit Court for Baltimore City, Tracey Hawes, the appellant, was convicted of first-degree murder of Ricky Lee Cunningham, use of a handgun in the commission of a crime of violence, and wearing, carrying, or transporting a handgun. He was sentenced to life in prison and a consecutive ten years. Thereafter, he unsuccessfully pursued a direct appeal, a postconviction proceeding, two petitions to reopen the postconviction proceeding, a petition for writ of *habeas corpus*, and a motion for new trial. Undaunted, in 2010, he filed a petition for writ of actual innocence, under Md. Code (2001, 2008 Repl. Vol., 2013 Supp.) section 8-301 of the Criminal Procedure Article ("Cr. P.").[1,2] He requested a hearing. The court dismissed the petition without holding a hearing.

On appeal from that ruling, Hawes asks: "Whether the Circuit Court erred in summarily denying [his] Petition for Writ of Actual Innocence without a hearing, where the Petition satisfied [Cr. P. section 8-301]?" Concluding that the circuit court did not err, we shall affirm its order.

## FACTS AND PROCEEDINGS

1.      *The Murder Trial*.[3]

---

[1] Unless otherwise stated, all statutory references in this opinion are to the Criminal Procedure Article.

[2] The current version of section 8-301 is not substantially different from that in effect when Hawes filed his petition in 2010.

[3] The "Petition for Writ of Actual Innocence" contains a summary of the facts in evidence at the 1994 trial. Also, the petition was filed in the record of the Ricky Lee Cunningham murder case, which includes the trial transcript.

On July 21, 1993, at about 3:00 p.m., Ricky Lee Cunningham was walking along Fremont Street, in Baltimore City, when he was shot twice in the back, sustaining fatal wounds. Wendy Washington was walking next to Cunningham when he was shot. The two had just used heroin and cocaine together. A police officer who responded to the scene of the shooting saw Washington there. He thought she either was in shock or was intoxicated.

Washington was transported to police headquarters and placed in an interview room. There she was observed removing a hypodermic needle from her purse and trying to hide it. A search of her purse revealed drug paraphernalia. Washington was questioned by Detectives David Brown and Rick James, of the Baltimore City Police Department. She told them she could not identify the shooter. She described him as a black male, "taller," of medium build, and wearing maroon shorts, a white shirt, and tennis shoes with no socks. After the interview, Washington was arrested on various drug charges.

About a month later, Washington returned to police headquarters and was shown a photographic array that included Hawes's picture. She selected his photograph and stated that he was the person who had shot Cunningham. Before trial, Hawes, through counsel, made discovery requests, including a request for all police reports concerning the Ricky Lee Cunningham murder. The State's discovery disclosures did not include any police reports.

At trial, Washington identified Hawes as the shooter. She explained that she did not identify him in her initial interview by the detectives (on the day of the shooting) because she was "scared." She acknowledged having used heroin and cocaine before the shooting, but

2

said she had used less that day than she usually did. She testified that, when she heard gunshots, she looked behind her, over her right shoulder, but did not see anyone. She looked to the left, where Cunningham had fallen to the ground and was clutching his back. Washington then saw a man running down the street holding a silver gun. Washington denied that she was mistaken in her in-court identification of Hawes as that man.

Detective Brown testified that he worked on the Cunningham homicide with Detective James, and interviewed Washington at the station house about two hours after the shooting. According to Detective Brown, during the interview, "[Washington] gave us information that I found, in my experience, not to be 100 percent truthful. She was quite frightened and quite shook up by the incident." Detective Brown stated on direct examination that Cunningham had ingested heroin and cocaine two to three hours before his death. On cross-examination, Detective Brown testified that during the July 21, 1993 interview, Washington had "appeared to be under the influence of alcohol or drugs." Detective Brown was not asked whether he or Detectives James had prepared a report of their July 21, 1993 interview of Washington.

Shenika Spencer, Cunningham's niece, testified that on August 1, 1993, ten days after the shooting, she saw Hawes point a gun at Cunningham's brother, Gwynn Cunningham ("Gwynn"), and threaten him. She heard Hawes warn Gwynn,

> You [Gwynn] and your brother [the victim] look just alike. We made a mistake. Now I know it's you and we going to – I'm going to put you where your brother at.

3

Spencer further testified that Hawes said, "I'm going to get him [referring to Gwynn], because he had no business taking my stuff." According to Spencer, the police were called, but before they arrived Hawes gave his gun to a woman in the vicinity.

Latina Davis testified that she was present when Hawes confronted Gwynn. (She was 15 years old at the time). Davis corroborated Spencer's testimony about that encounter. She testified that Hawes told Gwynn, "I killed your brother. That was a mistake. But I got the right one now. You and your brother look just alike and I'm going to put you where your brother at."

Veronica Cunningham, sister of the victim and of Gwynn, testified that on August 2, 1993, she scolded Hawes for threatening Gwynn with a gun. Hawes responded by saying that Gwynn had stolen his gun and he still was going to "get" Gwynn. He also said that he did not kill her brother (Cunningham).

Hawes testified on his own behalf. He stated that when the shooting took place he was at 1302 Pennsylvania Avenue with his friend, Lance Gordon. (The defense did not call Lance Gordon as a witness.) They were watching television. Hawes claimed he did not know Cunningham and did not kill him. He testified that, in late July of 1993, Gwynn stole $20 from him. On August 1, 1993, he and Gwynn saw each other, and he wanted to fight Gwynn. Gwynn ran into a building and called the police. The police came and searched him (Hawes). They did not find a gun. Hawes testified that he told the police that Gwynn had robbed him.

4

Hawes further testified that he told Veronica Cunningham he did not kill her brother but did not tell her who had, in fact, killed her brother. He identified a person who goes by the name "Black Jessie" as the man who shot and killed Cunningham. He also testified that he had never before seen Spencer or Davis.

Carl Willburn, an acquaintance of Hawes who first met him two or three months before the shooting, testified that he witnessed Cunningham being gunned down. He saw the shooter run down the street, fire three shots at Cunningham, and then run away. He described the shooter as a black man, 5'6" tall, with dark skin, and wearing shorts, a T-shirt, and shoes without socks. According to Willburn, when the police arrived at the scene of the shooting, he announced that he had seen what had happened, but no one paid any attention to him. Later, after following the story in "the paper," he asked a police officer if the shooter had been found. The officer replied that the police "had the person" and that "it was [Hawes]." Willburn told the officer that Hawes was not the shooter. Once again, no one paid attention to what he had to say.

The State called Gwynn on rebuttal. He testified that he knew Hawes and that he had never robbed Hawes. He further testified that on August 1, 1993, Hawes confronted him with a gun and demanded to know where his guns and drugs were, saying, "Yeah, you think I killed your brother. . . . I'm going to kill your punk bitch ass now. . . . I got the right one now. Where my shit at?"

2.      ***Direct Appeal.***

5

After conviction and sentencing, Hawes noted a direct appeal. In his brief in this Court he argued: 1) the trial court improperly instructed the jury on the premeditation element of first-degree murder; and 2) the evidence was legally insufficient to support his convictions. This Court issued an unreported *per curiam* opinion. *Hawes v. State*, No. 675, September Term, 1994. We held on the first issue that no objection was lodged to the instruction and that plain error review was not warranted because the instruction as given was not erroneous in any event. On the second issue, we held that the argument was not raised in a motion for judgment, and therefore was not preserved for review, but even if it had been, the issue lacked merit because the evidence was legally sufficient to support the convictions. Our opinion was filed on January 27, 1995, and the mandate was issued on February 27, 1995.

3. ***Postconviction Proceeding.***

On March 28, 1997, Hawes filed a petition for postconviction relief, which he amended on August 20, 1997. He alleged a number of constitutional wrongs. First, he alleged that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), because Detectives Brown and James in fact had prepared, on August 3, 1993, a report summarizing their July 21, 1993 interview of Washington, but the State failed to produce the report before

6

trial.[4] Second, Hawes alleged the trial court gave an erroneous reasonable doubt instruction.[5]

Third, Hawes alleged the State knowingly introduced perjured testimony.[6] And, finally,

Hawes alleged that his trial counsel had failed to object to the erroneous reasonable doubt

instruction, prepare for trial, and investigate the August 3, 1993 police report.[7]

In his amended petition for postconviction relief, Hawes alleged that on January 7,

1995, he made a request for the file of the Ricky Lee Cunningham homicide case, pursuant

to the Maryland Public Information Act, and that the documents produced in response to the

PIA request included the August 3, 1993 report by Detectives Brown and James about their

July 21, 1993 interview of Washington.

On February 13, 1998, the court held a hearing on the petition for postconviction

relief. Hawes was represented by counsel. He testified, as did his trial counsel, Alvin

Alston, Esquire. Hawes moved into evidence a written statement given by Washington to

---

[4]Hawes alleged that this violated his due process and equal protection rights to a fair
trial under the Sixth and Fourteenth Amendments.

[5]Hawes likewise alleged that this violated his due process and equal protection rights
to a fair trial under the Sixth and Fourteenth Amendments.

[6]Hawes alleged that this constituted a denial of his due process and equal protection
rights under the Fifth and Fourteenth Amendments. It is unclear what testimony he was
complaining about.

[7]Hawes alleged that this deprived him of his right to effective assistance of counsel,
under the Sixth and the Fourteenth Amendments.

the police on July 21, 1993 (the day Cunningham was murdered),[8] and the August 3, 1993

report by Detectives Brown and James about their July 21, 1993 interview of Washington.

Page 3 of the August 3, 1993 report states, in relevant part:

> [Cunningham and Washington] then walked east on Harlem Avenue, then
> south on Fremont Avenue. [Washington] states when they were in the middle
> on [sic] the block she "heard some shots" and "turned to her right to see where
> they were coming from." (note: this direction would be towards the rowhouses
> and away from the suspect's location, which would be behind them and from
> the street). She then turns to her left, observes the victim grab his side and fall
> to the sidewalk. It is at this point she observes the suspect, gun in hand,
> running down Fremont (south) and right on Edmondson Avenue (west). Ms.
> Washington's recollection of the event is simply not credible. She describes
> only seeing the shooters' back, saying he was wearing a white shirt, maroon
> shorts, tennis shoes with no socks. Also that he was taller than the witness
> with the medium build.[9]

By memorandum opinion and order of March 27, 1998, the postconviction court

denied all relief. The court found that although Washington's written statement and the

August 3, 1993 report were not produced by the State to the defense, the information in them

had been fully communicated to the jurors during trial. In particular, the jurors were made

aware of what Washington had told Detectives Brown and James on July 21, 1993, and,

through the testimony of Detective Brown, that, in the detective's view, the information she

gave that day was not 100% truthful.[10] The jurors also had learned that, during the July 21,

1993 interview, Detective Brown had observed that Washington appeared to be under the

---

[8]This statement is not in the record.

[9]It is not clear which witness this refers to.

[10]Detective James had not testified at trial.

8

influence of alcohol or drugs. When Detective Brown interviewed Washington again a month later, however, she was sober. In addition, Hawes knew before trial that Washington had been arrested for drug offenses at the close of her July 21, 1993 interview. The postconviction court found "there is no evidence which would remotely suggest that the State withheld exculpatory information from the defense."

The postconviction court went on to rule that the reasonable doubt instruction as given included everything a proper reasonable doubt instruction must say. It rejected the allegations of ineffective assistance of counsel, under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In particular, the postconviction court concluded that Alston had not performed deficiently in failing to object to the reasonable doubt instruction, as the instruction was proper; and there was no evidence that Alston had failed to prepare for trial or to look into the police report. The court credited Alston's testimony that "his recollection and file records indicate significant time was spent conferring with [Hawes], [the prosecutor], and preparing for trial."

Hawes applied for leave to appeal the postconviction court's decision. The application was denied by this Court on June 25, 1998.[11]

4. ***Motion to Reopen Petition for Postconviction Relief***.

---

[11]On July 23, 2003, the appellant filed a second "Petition for Post Conviction Relief" that was dismissed without prejudice and without a hearing on November 21, 2003.

Seven years later, on July 27, 2005, Hawes filed a "Motion to Reopen Petition for Post Conviction Relief," in which he asserted that his postconviction lawyer had rendered ineffective assistance of counsel. Specifically, he argued that postconviction counsel had failed to allege that trial counsel had provided ineffective assistance by not objecting to that part of the first-degree murder instruction addressing intent to kill (which Hawes refers to as the "intent instruction," and which we shall too, for the sake of consistency) and had failed to allege that appellate counsel had provided ineffective assistance by not raising the erroneous intent instruction as plain error on direct appeal. Hawes further argued that postconviction counsel had provided ineffective assistance by failing to allege that trial counsel had been ineffective by not seeking an alibi instruction. Finally, Hawes claimed that postconviction counsel had rendered ineffective assistance by failing to allege that the State had violated certain discovery rules and had used perjured testimony.

On November 14, 2005, the court denied the motion to reopen, without a hearing. It filed a statement of the reasons for its ruling. In it, the court observed that Hawes intelligently and knowingly waived the alleged irregularities in the first-degree murder jury instruction by failing to raise the issue, either on appeal or in his first postconviction petition. On the issue of the alibi instruction, the court stated that, under the circumstances, trial counsel's failure to request an alibi instruction was not an omission so deficient as to have violated the Sixth Amendment.

10

Hawes filed an application for leave to appeal to this Court, which was denied on May 4, 2006.

5.  ***Second Motion to Reopen Petition for Postconviction Relief***.

On April 3, 2007, Hawes filed a second "Motion to Reopen Petition for Post Conviction Relief."  He filed an amendment to that motion on July 17, 2007.  Without holding a hearing, the court denied the motion in a memorandum opinion and order dated December 28, 2007.  The court concluded that all of the issues raised had been addressed and decided either in the court's decision rejecting the petition for postconviction relief or in the court's decision rejecting the first motion to reopen.

6.  ***Petition for Writ of Habeas Corpus***.

On February 27, 2009, Hawes filed a "Petition for Habeas Corpus Relief" or, in the alternative, a third motion to reopen his postconviction case.  He alleged that the court had erred in denying his second motion to reopen, because he had been convicted based upon defective reasonable doubt and intent to kill instructions, and because the court had erred in failing to find ineffective assistance of counsel both in ruling on the original postconviction petition and on the motions to reopen. On June 25, 2009, the court denied relief on the grounds that the petition did not allege facts sufficient to support *habeas corpus* relief and that the other issues had been fully and finally litigated.  This Court denied an application for leave to appeal on June 28, 2010.

7.  ***Motion for New Trial***.

11

In the meantime, on May 29, 2009, Hawes filed a motion for new trial. He alleged that Alston's failure to object to the intent instruction and to request an alibi instruction constituted ineffective assistance of counsel, and that Washington was not a credible witness. He did not make any allegation of newly discovered evidence (nor would any such allegation have been timely under Rule 4-331(c)). A hearing was held on August 30, 2011. After holding the matter *sub curia*, the court denied the motion on September 21, 2012.

8.      ***Petition for Writ of Actual Innocence****.*

On September 28, 2010, Hawes filed a "Petition for Writ of Actual Innocence," pursuant to Cr. P. section 8-301. Before delving into the specifics of his petition, the denial of which is what is before us on appeal, we shall review the relevant portions of the statute and related Rule 4-331.

Under section 8-301, a circuit court in which a person was convicted of a crime may issue a writ of actual innocence. In the petition seeking such a writ, the convicted person must claim that there is "newly discovered evidence" that "(1) creates a substantial or significant possibility that the result [of his or her trial] may have been different, as that standard has been judicially determined; and (2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331." Cr. P. § 8-301(a). The petition "shall" "be in writing," "state in detail the grounds on which the petition is based," "describe the newly discovered evidence," "distinguish the newly discovered evidence claimed in the petition

12

from any claims made in prior petitions," and contain or attach a request for a hearing, if a hearing is being sought. Cr. P. § 8-301(b).

Central to the case at bar, section 8-301(e) states:

> (1) Except as provided in paragraph (2) of this subsection, the court shall hold a hearing on a petition filed under this section if the petition satisfies the requirements of subsection (b) of this section and a hearing was requested.
> (2) The court may dismiss a petition without a hearing if the court finds that the petition fails to assert grounds on which relief may be granted.

Rule 4-331 governs motions for new trial in criminal cases. As pertinent here, the rule states in subsection (c):

> **Newly discovered evidence.** The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:[12]
> (1) on motion filed within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post conviction relief . . . .[13]

---

[12] Section (a) of Rule 4-331 allows the court to order a new trial "in the interest of justice," if the defendant files a motion for new trial "*within ten days after a verdict*." (Emphasis added.)

[13] Subsection (c)(2) applies when a sentence of death was imposed and subsection (c)(3) applies when there is DNA testing not subject to "the procedures of Code, Criminal Procedure Article, § 8-201 or other generally accepted scientific techniques the results of which, if proved, would show that the defendant is innocent of the crime of which the defendant was convicted." These subsections are not applicable to the case at bar.

13

Hawes filed his "Petition for Writ of Actual Innocence" ("the petition") with three attached exhibits. The first is a June 21, 2005 affidavit by Alston.[14] In it, Alston attests that he was Hawes's trial counsel in the Cunningham murder case; that after reviewing the trial court's intent instruction, he is "of the opinion that the instruction was erroneous"; that, when the trial was in progress, in 1994, he did not realize that the intent instruction was erroneous, or he would have objected to it; that his failure to object to the intent instruction was not strategic or tactical; that he did not request an alibi instruction; that an alibi instruction would have been warranted under the evidence; that the trial court did not give an alibi instruction; and that his failure to request an alibi instruction was not a strategic or tactical decision.[15]

Hawes's second exhibit is his own affidavit, dated September 15, 2010. In it, he attests that he "was not aware of the ineffective assistance of [his] first postconviction attorney until 2005, when [the lawyer representing him in his first motion to reopen the postconviction case] advised [him] of it." He further attests that "Detective James was supposed to testify at trial, but the State said that he was out of toen (sic) at the time of trial." Finally, Hawes's third attached exhibit is page 3 of the August 3, 1993 report by Detectives Brown and James.

---

[14] Alston's affidavit originally was filed on July 27, 2005, in support of Hawes's first motion to reopen his postconviction case.

[15] The record of the Cunningham murder trial shows that Alston in fact filed a written request for an alibi instruction, on December 2, 1993, more than two months before trial.

As we have noted, in the petition Hawes reviews the evidence adduced at his murder trial. He also sets forth the chronological history of his direct appeal and all the post-judgment proceedings we have described above. Finally, he states three separate claims, any one of which, he maintains, would support the issuance of the writ of actual innocence.

Hawes's first claim concerns the intent instruction. He alleges that the instruction was erroneous; Alston did not object to it at trial; neither Alston nor he knew the instruction was erroneous at the time of trial; by the time Alston signed his June 21, 2005 affidavit, he had come to realize that the instruction was erroneous; Hawes learned, when he read Alston's June 21, 2005 affidavit (in the course of preparing for his motion to reopen his postconviction proceeding) that the instruction was erroneous and that Alston had come to realize that it was erroneous; and this information – that as of June 21, 2005, his trial counsel understood that the intent instruction given at trial was erroneous – is "newly discovered evidence" that he (Hawes) could not have discovered in time to move for a new trial under Rule 4-331 and that creates "a substantial or significant possibility that the result [at trial] may have been different."

Hawes's second claim is similar but concerns the alibi instruction. He avers that only by reading Alston's June 21, 2005 affidavit did he (Hawes) come to learn that an instruction could have been given at trial in support of his defense that he was not present at the scene of the shooting and indeed was elsewhere and with someone when the shooting happened. He alleges that this is "newly discovered evidence" that he could not have discovered in time

15

to file a motion for new trial and that creates a substantial or significant possibility that he would not have been convicted.

Third, and finally, Hawes claims that the August 3, 1993 report by Detectives Brown and James also constitutes "newly discovered evidence" that could not have been discovered in time for him to file a motion for new trial, and creates a substantial or significant possibility that he would not have been convicted.

The circuit court, through one judge, scheduled a hearing on the petition for January 2, 2011. That hearing date was postponed and was reset for May 19, 2011. In the meantime, however, by order of February 15, 2011, the circuit court, through another judge, denied the petition, without a hearing, on the ground that it failed to state a claim or assert grounds for which relief could be granted under section 8-301(a). Within 30 days of the entry of that order, Hawes noted this appeal.

## DISCUSSION

Hawes contends the circuit court erred in dismissing his Petition for Writ of Actual Innocence at all, and particularly without holding a hearing. As explained, under section 8-301(e)(1), a court shall hold a hearing on such a petition if the petitioner satisfies the requirements of subsection (b) and a hearing was requested. But, under 8-301(e)(2), a court may dismiss the petition "without a hearing if the court finds that the petition fails to assert grounds on which relief may be granted."

Hawes maintains that the allegations in his petition satisfy all the requirements of section 8-301(b). It is undisputed that the petition is in writing, that it states in detail the grounds on which it is based, and that it includes a request for a hearing. *See* Cr. P. § 8-301(b)(1), (2), and (4). Hawes asserts that his petition describes the claimed "newly discovered evidence," as subsection (b)(3) requires. Specifically, he points out that he has alleged evidence of ineffective assistance of trial counsel (*i.e.*, not objecting to an improper intent instruction and not requesting a relevant alibi instruction) that he could not have discovered until Alston attested, in his affidavit, to the errors he made as trial counsel, which was long after the deadline for filing a new trial motion under Rule 4-331(c). Likewise, Hawes maintains that the August 3, 1993 report by the detectives about their interview of Washington was newly discovered evidence that he (Hawes) could not have discovered until after that same deadline.

Hawes asserts that the subsection (b)(5) requirement that the petition "distinguish the newly discovered evidence claimed in the petition from any claims made in prior petitions" only requires a petitioner to distinguish the newly discovered evidence alleged from that alleged in any prior petition for writ of actual innocence he or she filed. *See Douglas v. State*, 423 Md. 156, 184-85 (2011). Therefore, having never before filed a petition for writ of actual innocence, Hawes's petition satisfied that requirement. He takes the position that, having satisfied the procedural requirements of section 8-301(b) and set forth grounds on

which relief could be granted, under 8-301(a)(1) and (2), he was entitled to a hearing, and his petition could not properly have been dismissed without one.

The State's response is two-fold. First, it argues that Hawes's petition properly was denied without a hearing because, under the Uniform Postconviction Procedure Act, codified at Cr. P. sections 7-101, *et seq.* ("the UPPA"), his claims either were fully litigated or waived. As the State sees it, all of the issues Hawes now pursues either were raised or could have been raised in his postconviction case, and therefore may not now serve as the basis for a petition for writ of actual innocence. This is so, the State argues, because section 8-301 "does not implicitly abrogate the [UPPA]. Nor does the Petition for Writ of Actual Innocence serve as a mechanism for the direct appeal of the denial of a post-conviction claim."

Second, the State argues that on its face and as a matter of law Hawes's petition fails to satisfy the requirements of section 8-301(a), and therefore properly was dismissed without a hearing. Specifically, the State maintains that Alston's affidavit respecting the intent instruction and the alibi instruction are not "evidence" and therefore cannot be "newly discovered evidence"; and the contents of the detectives' report about their interview of Washington was "evidence," but was not "newly discovered."

1. **Claims Finally Litigated or Waived**.

In *Douglas v. State*, 423 Md. 156, the Court of Appeals held that the denial of a petition for writ of actual innocence is a final judgment under Md. Code (1973, 2013 Repl.

18

Vol.), section 12-301 of the Courts and Judicial Proceedings Article ("CJP"). Because CJP

section 12-301 permits an appeal from a final judgment unless expressly denied by law, the

Court was faced with the question whether the appeal-stripping provision of Cr. P. section

7-107(b)(1), which is part of the UPPA, applied to preclude an appeal from the denial of a

motion for writ of actual innocence. Section 7-107(b)(1) states:

> In a case in which a person challenges the validity of confinement under a
> sentence of imprisonment by seeking the writ of habeas corpus or the writ of
> coram nobis or by invoking a common law or statutory remedy other than this
> title, a person may not appeal to the Court of Appeals or the Court of Special
> Appeals.

The *Douglas* Court observed that "[t]he purpose of the UPPA was to streamline 'into

one simple statute all the remedies, beyond those that are incident to the ususal procedures

of trial and review, which are . . . present[ly] available for challenging the validity of a

sentence.'" 423 Md. at 175 (alteration in original) (quoting *State v. Zimmerman*, 261 Md.

11, 24 (1971), in turn quoting *State v. D'Onofrio*, 221 Md. 20, 29 (1959)). It explained:

> The UPPA does not eliminate alternative remedies, such as habeas corpus,
> coram nobis, or other common law or statutory remedies, though it restricts the
> right to appeal orders pursuant to those traditional remedies. But where the
> UPPA does not provide a remedy, the preclusive effects of [Cr. P. section] 7-
> 107(b)(1) do not apply.

*Id*. (citations omitted).

The Court further observed that "[i]t is settled that questions of guilt or innocence

cannot be raised in petitions for postconviction relief" and that "'a petition for postconviction

relief is not a substitute for a motion for new trial.'" *Id.* (quoting *Roe v. Patuxent Inst.*, 240

Md. 717, 719 (1965) (*per curiam*)). It distinguished section 8-301 from the UPPA, explaining that a petition for writ of actual innocence "is necessarily part of the usual procedures of trial and review available to a criminal defendant that were not intended to fall within the scope of postconviction relief." *Id*. at 177 (internal quotation marks omitted) (citation omitted). The UPPA thus does not apply to claims permitted by 8-301 – of actual innocence, based on newly discovered evidence – and it follows that "the preclusive effects of [Cr. P. section] 7-107(b)(1) do not apply." *Id.* at 175.[16]

In the case at bar, the State argues that the issues raised by Hawes in his petition all either were waived or finally adjudicated under the UPPA, specifically Cr. P. sections 7-102(b) and 7-106, and the holding in *Douglas* does not negate that position. Before discussing the specifics of the State's argument, we set forth the relevant provisions of the UPPA. Section 7-102(b) states that

[a] person may begin a [postconviction] proceeding . . . if:

(1) the person seeks to set aside or correct the judgment or sentence; and

---

[16]As Hawes correctly asserts, the *Douglas* Court also held that the requirement in section 8-301(b) that a petitioner "distinguish the newly discovered evidence claimed in the petition from any claims made in prior petitions" encompasses claims made in prior petitions for writs of actual innocence, not claims made in prior petitions filed under the UPPA. 423 Md. at 184-185 ("[The defendant] asserts that the phrase 'prior petitions' does not refer to every prior filing. We, too, are persuaded that the language does not extend so broadly. As this was [the defendant's] first petition under [Cr. P. section] 8-301, he has no claims to distinguish."). *See also Keyes v. State*, ___ Md. App. ___, Slip Op. No. 2552, Sept. Term, 2011 (filed January 28, 2014), at 8.

20

(2) *the alleged error has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that the person has taken to secure relief from the person's conviction.*

(Emphasis added.)  Cr. P. section 7-106(a) addresses final adjudication.  It states:

> [A]n allegation of error is finally litigated when:  (1) an appellate court of the State decides on the merits of the allegation:  (i) on direct appeal; or (ii) on any consideration of an application for leave to appeal filed under § 7-109 of this subtitle; or (2) a court of original jurisdiction, after a full and fair hearing, decides on the merits of the allegation in a petition for a writ of habeas corpus or a writ of error coram nobis, unless the decision on the merits of the petition is clearly erroneous.

> Cr. P. section 7-106(b)(1)(i) addresses waiver.  It states that, with one exception, an

allegation of error is waived

> when a petitioner could have made but intelligently and knowingly failed to make the allegation:
> 1. before trial;
> 2. at trial;
> 3. on direct appeal, whether or not the petitioner took an appeal;
> 4. in an application for leave to appeal a conviction based on a guilty plea;
> 5. in a habeas corpus or coram nobis proceeding began by the petitioner;
> 6. in a prior petition under this subtitle; or
> 7. in any other proceeding that the petitioner began.[17]

Cr. P. section 7-106(b)(2) creates a rebuttable presumption that the petitioner intelligently and knowingly failed to make an allegation that he or she could have made in one of the proceedings listed in subsection 7-106(b)(1)(i).

---

[17]The exception provides that failure to make an allegation of error shall be excused if special circumstances exist; the burden is on the petitioner to prove the existence of special circumstances.  Cr. P. § 7-106(b)(1)(ii).

The State argues that under *Arrington v. State*, 411 Md. 524 (2009), these UPPA final litigation and waiver provisions control in this case, and *Douglas* did not change that. In *Arrington*, in 1995, the defendant was convicted of second degree murder in the stabbing death of a man at a birthday party attended by many people. His conviction was upheld on direct appeal. In 2000, he filed a petition for postconviction relief on the ground of ineffective assistance of counsel. He argued that his trial counsel's representation had been deficient because he had not ordered DNA testing of blood that was on the pants he (the defendant) was wearing at the time of the stabbing. The defendant testified at the postconviction hearing that he had told his trial counsel that the blood was from a woman he had had sex with. Trial counsel had decided not to have the blood tested for DNA because he thought the defendant's explanation was unlikely to be believed and because there were numerous eyewitnesses to the stabbing who had identified the defendant as the stabber. The postconviction court ruled against the defendant, finding that his trial counsel's performance had not been deficient.

In 2003, the defendant filed a motion to preserve evidence and conduct DNA testing under Cr. P. section 8-201. That statute provides that "[n]otwithstanding any other law governing postconviction relief" a person who has been convicted of certain crimes, including second degree murder, may petition for DNA testing of scientific identification evidence that is related to the judgment of conviction. Cr. P. § 8-201(b). When specified criteria are met, the court shall order DNA testing. Cr. P. § 8-201(d). If the test results are

unfavorable to the petitioner, the court must dismiss the petition; if they are favorable to the petitioner, the court must initiate a postconviction proceeding or reopen any previous postconviction proceeding. Cr. P. § 8-201(i).

The court granted the defendant's motion for DNA testing and the test results revealed that the blood on his pants was not from the stabbing victim. In 2006, the defendant filed a motion to reopen his postconviction proceeding and for new trial. He asserted that the evidence that there was blood on the pants he was wearing at the time of the stabbing had been used by the prosecutor to mislead the jurors in his trial into thinking the blood was from the victim, and therefore that he was the stabber. He further complained that his conviction was based on eyewitness testimony that, in his view, was unreliable. Finally, he alleged that his trial counsel had been ineffective by failing to have the blood evidence DNA tested and by failing to make adequate use on cross-examination of exculpatory information contained in certain police reports.

After a hearing, the court granted the motion to reopen postconviction proceeding as to the DNA blood evidence but denied the motion to reopen as to the ineffective assistance of counsel claim. The court also denied the motion for new trial. In a memorandum opinion, the court ruled that the newly discovered DNA evidence did not establish actual innocence. The court further ruled that even if the standard for granting a new trial under Cr. P. section 8-201 is not proof of actual innocence but proof of a substantial or significant possibility that the verdict would have been affected by the newly discovered evidence, the DNA test results

23

showing that the blood on the defendant's pants did not belong to the victim did not raise a substantial or significant possibility that the verdict would have been different, given that multiple eyewitnesses had seen the defendant stab the victim. The court rejected the ineffective assistance of counsel claims on the basis that counsel's alleged failure to order DNA testing had been finally litigated in the original postconviction proceeding. The court further rejected the allegation that trial counsel had failed to use exculpatory information contained in police reports because that allegation could have been raised in the original postconviction proceeding but was not, and therefore was waived. The court observed that all of the exculpatory evidence contained in police reports had been known to the defense before trial, and of course before the postconviction proceeding.

The case ultimately went before the Court of Appeals, which affirmed in part and reversed in part. It held that the UPPA's finality of litigation principles precluded the defendant from making claims of ineffective assistance of counsel in the reopened postconviction proceeding when the claims either had been made, or could have been made, in the original postconviction proceeding. Accordingly, the circuit court properly had dismissed the ineffective assistance of counsel claims. The Court concluded, however, that the circuit court had erred in denying the motion for new trial based on the newly discovered DNA blood test results. The Court explained that under section 8-201 it is not necessary for the petitioner to show actual innocence; it is sufficient that he show that the newly obtained

24

scientific evidence raises a substantial or significant possibility that the verdict would have been different, and the defendant had shown such a possibility.

We disagree with the State that, under *Arrington,* Hawes's claims in his Petition for Writ of Actual Innocence were finally litigated or waived under the UPPA and for that reason were subject to dismissal under section 8-301(e)(2), without a hearing, for failure to assert grounds for which relief could be granted. Section 8-201, the operative statute in *Arrington,* is tied to the UPPA. As explained, it requires the circuit court to initiate a postconviction proceeding or reopen a prior postconviction proceeding when DNA testing of scientific identification evidence is favorable to the petitioner. Because the remedy afforded by that statute is a postconviction proceeding, the UPPA applies, including the final adjudication and waiver provisions of the UPPA. Notably, with respect to the motion for new trial, which was not tied to the UPPA, the *Arrington* Court did not apply those provisions.

In contrast, as the *Douglas* Court made clear, section 8-301 creates a procedure and affords remedies wholly separate and distinct from the UPPA. 423 Md. at 177. This analysis was essential to the holding in *Douglas* that the appeal-stripping provision of the UPPA, as codified in section 7-107(b)(1), did not apply to preclude an appeal, under CJP section 12-301, from an order denying a petition for writ of actual innocence under Cr. P. section 8-301. That analysis controls the outcome of the State's final adjudication and waiver argument. The provisions of the UPPA that preclude bringing claims that have been fully litigated or waived apply to postconviction claims. A claim of newly discovered evidence brought

25

pursuant to a petition for writ of actual innocence is not a postconviction claim, and is not affected by the full adjudication or waiver provisions of the UPPA. The State's argument that the principles of final adjudication and waiver embodied in the UPPA preclude Hawes from pursuing a petition for writ of actual innocence thus fails.

2.    ***Dismissal Without a Hearing of Petition for Writ of Actual Innocence.***

The substantive merits question in this appeal is whether, as a matter of law, the allegations in Hawes's Petition for Writ of Actual Innocence fail to state the elements required to be pleaded by section 8-301(b), and, if they do state those elements, whether the petition nevertheless fails to state a claim or assert grounds on which relief may be granted under section 8-301(a). In *Douglas,* the Court explained:

> [A] trial court may dismiss a petition [for writ of actual innocence] without a hearing when one was requested, pursuant to [Cr. P.] § 8–301(e)(2), only when a petitioner fails to satisfy the pleading requirement. The pleading requirement mandates that the trial court determine whether the allegations could afford a petitioner relief, if those allegations would be proven at a hearing, assuming the facts in the light most favorable to the petitioner and accepting all reasonable inferences that can be drawn from the petition. That is, when determining whether to dismiss a petition for writ of actual innocence without a hearing pursuant to [Cr. P.] § 8–301(e)(2), provided the petition comports with the procedural requirements under [Cr. P.] § 8–301(b), the trial court must consider whether the allegations, if proven, consist of newly discovered evidence that "could not have been discovered in time to move for a new trial under Maryland Rule 4–331" and whether that evidence "creates a substantial or significant possibility that the result of the trial may have been different." [Cr. P.]§ 8–301(a).

423 Md. at 180 (alteration omitted). Neither evidence "that was clearly known during trial," nor "procedural errors committed by the trial court" are newly discovered evidence. *Id.*

26

> If, however, the petition alleges newly discovered evidence that "could not have been discovered in time to move for a new trial under Maryland Rule 4–331," and which "creates a substantial or significant possibility that the result may have been different," then it would be error to dismiss the petition merely because the petition itself did not convince the trial court without a hearing.

*Id*. at 180 - 81.

*Douglas* consisted of two consolidated appeals – one by Ellis Richard Douglas and one by Lamont Curtis. In both cases, the circuit court had dismissed the defendant's petition for writ of actual innocence without holding a hearing. Douglas had been convicted in 1990 of attempted murder and related crimes in the shootings of several police officers. In his appeal, the Court of Appeals concluded that his petition for writ of actual innocence satisfied the pleading requirements of section 8-301(b). It was in writing; stated in detail the grounds on which the petition was based; described the claimed newly discovered evidence; and distinguished the claimed newly discovered evidence from any claims made in prior petitions for writ of actual innocence. It also requested a hearing.

The Court then considered whether, even though the pleading requirements of section 8-301(b) were satisfied, the petition properly was dismissed without a hearing for failure to assert grounds on which relief may be granted. In his petition, Douglas alleged that there was newly discovered evidence that one of the police officers called as a witness by the State at trial testified falsely about his credentials. In support of the allegation, Douglas submitted a newspaper article from 2007 (17 years after his conviction) reporting that "[q]uestions regarding [that particular officer's] credentials were raised several weeks ago by state public

27

defenders working with the Innocence Project" after the public defenders noted inconsistencies in transcripts of proceedings in which the officer had testified about his credentials. *Id*.

The Court held that "viewing the inferences in the light most favorable to Douglas, it could be that the evidence could not have been discovered within time to move for a new trial under Rule 4-331." *Id*. at 186. The Court further held that Douglas's allegations that perjured testimony by the officer in question resulted in his not receiving a fair trial were sufficient to "assert a basis that the newly discovered evidence creates a substantial or significant possibility that the result of [Douglas's trial] may have been different." *Id*. (alteration omitted)(internal quotation marks omitted). The Court vacated the order dismissing the petition for writ of actual innocence, ruling that Douglas was entitled to a hearing.

The Court reached a different result in Curtis's appeal. In 1994, Curtis was convicted of attempted murder and related crimes arising out of the shooting of a man who was "hacking," that is, working unlawfully as a taxi cab driver. The victim identified Curtis as the man who shot him. Investigating officers went to Curtis's last known address and spoke to his grandmother. On the report of that visit, one of the officers wrote the grandmother's name (which included the first name Margaret) and also wrote "Margaret Eri." At trial, a witness called by the defense testified that a man who did not resemble Curtis was the shooter. On cross-examination, the State elicited that that witness had been approached by

a friend named "Aaron" about testifying for Curtis. In closing, the prosecutor argued that "Aaron" really was a friend of Curtis's named "Airy" or "Eri" – the same name as on the report taken from Curtis's grandmother – and that this friend had acted on Curtis's behalf to coerce the witness into testifying for the defense.

In 2010, Curtis filed a petition for writ of actual innocence, claiming that he had newly discovered evidence in the form of an affidavit from his grandmother in which she swore she had never mentioned the name "Airy" or "Eri" to the police when they spoke to her during their investigation. Curtis alleged that he could not have obtained this evidence in time to move for a new trial because his grandmother "had fallen ill from the shock of [his] conviction and could not give an affidavit, and his imprisonment left him 'lost, confused and bewilder[ed] of what options he had.'" *Douglas*, 423 Md. at 169 (alteration in original). The circuit court denied the petition without a hearing.

The Court of Appeals affirmed the circuit court's dismissal without a hearing of Curtis's petition for writ of actual innocence. It concluded that the affidavit by Curtis's grandmother was not newly discovered evidence. The Court observed that in *Argyou v. State,* 349 Md. 587 (1998) – which concerned the meaning of the phrase "newly discovered evidence" in Rule 4-331(c) – it had explained that "'exculpatory evidence known . . . prior to expiration of the time for filing a motion for new trial, though *unavailable*, in fact, is not newly discovered evidence.'" 423 Md. at 187 (quoting 349 Md. at 600 n.9) (alteration omitted) (emphasis in *Douglas*). The exculpatory evidence in Curtis's case was known to

29

him in time to file a motion for new trial, even though it was not available to him. Thus, as a matter of law, it was not newly discovered evidence, and his petition for writ of actual innocence properly was dismissed without a hearing.

We return to the case at bar. Although not stated expressly by the *Douglas* Court, it nevertheless is clear that the standard of review of a circuit court's grant of a motion to dismiss a petition for writ of actual innocence without a hearing, pursuant to section 8-301(e)(2), is *de novo*. *See also Keyes v. State*, *supra*, slip op. at 10. The appellate court reviews the claims and allegations set forth in the petition and decides whether, on the face of the petition, they satisfy the pleading requirements of section 8-301(b) and, if so, whether they also satisfy the pleading requirement of section 8-301(a)(1) and (2), that there is "newly discovered evidence" that creates a substantial or significant possibility that the result [of the trial] may have been different" and "could not have been discovered in time to move for a new trial under Maryland Rule 4-331." These are legal determinations.

Hawes's Petition for Writ of Actual Innocence satisfies the pleading requirements of section 8-301(b). It is in writing, states in detail the grounds on which it is based, "describe[s] the newly discovered evidence," and requests a hearing. (As noted, under *Douglas*, there was no need to distinguish the described newly discovered evidence from any prior claims of newly discovered evidence because Hawes had not filed any prior petition for writ of actual innocence.)[18]

---

[18]Effective October 1, 2011, the Court of Appeals adopted Rule 4-332, which governs
(continued...)

As *Douglas* illustrates, however, a petition for writ of actual innocence may satisfy the requirements of section 8-301(b) but nevertheless fail to state grounds on which relief may be granted under section 8-301(a), and therefore be subject to dismissal without a hearing pursuant to section 8-301(e)(2). We conclude that that is the situation here.

It goes without saying that something that is not "evidence" cannot be "newly discovered evidence." The word "evidence" as used in Rule 4-331(c) necessarily means testimony or an item or thing that is capable of being elicited or introduced and moved into the court record, so as to be put before the trier of fact at trial. Here, evidence means testimony or an item or thing that could have been introduced at the 1994 Ricky Lee Cunningham murder trial.

Hawes's claims, in his petition, about the intent instruction that was given to the jury and the alibi instruction that was not requested are not claims of newly discovered evidence because nothing he alleges about these instructions is evidence. Alston's June 25, 2005 affidavit, attesting that he had come to realize that he should have objected to the intent instruction and should have requested an alibi instruction, is not "evidence" within the meaning of "newly discovered evidence" in Rule 4-331(c) and section 8-301. Alston's

---

[18](...continued)
petitions for writs of actual innocence. That rule applies to all such petitions filed on or after that date, *see Douglas v. State*, 423 Md. at 182 n.14, and therefore does not apply in this case, as the petition was filed in 2010. Rule 4-332 adds to the required information that must be set forth in a petition for writ of actual innocence, including a statement "that the conviction sought to be vacated is based on an offense that the petitioner did not commit." Md. Rule 4-332(d)(9).

realization in 2005 that he should have objected to the intent instruction given at trial and that he should have requested an alibi instruction is not a fact or item or thing that could have been admitted into evidence or used in examination or cross-examination of any witness at trial.

Indeed, when refocused upon the proper time-frame, the allegations become nonsensical. There never could have been testimony by Alston at the murder trial that he did not know that the intent instruction was erroneous and to object to it for that reason and that he did not think to request an alibi instruction. Obviously, if at the time of trial he realized the intent instruction was erroneous, he would have objected to it, not testified about it; and if he had realized that he needed to ask for an alibi instruction, he would have asked for one, not testified about it. Alston's testimony about his realizations, years after the trial, about instructions that were or were not given or requested is not evidence at all, in that it is not testimony that was susceptible of being put before the jury during the murder trial. Likewise, any testimony by Hawes that he later came to know that Alston later came to realize what Alston now believes is deficiency in his representation during the murder trial is not evidence. It is one-step removed "not evidence."

As none of this so-called evidence is evidence at all, it cannot be, and is not, newly discovered evidence for purposes of section 8-301(a). As a matter of law, the allegations in the petition about the jury instructions are not allegations of newly discovered evidence within the meaning of 8-301(a).

32

By contrast, the August 3, 1993 report by Detectives James and Brown about their July 21, 1993 interview of Washington is "evidence." It is a piece of paper that existed prior to the murder trial and was capable of being used or introduced and becoming a part of the record before the jury.

As noted, before trial in the Cunningham murder case, the State did not reveal the August 3, 1993 report in its discovery disclosure. Hawes made a discovery request, and then, on November 9, 1993, more than three months before the February 16 and 17, 1994 trial, filed a "Motion for Subpoena for Tangible Evidence Before Trial," requesting production of the "police reports and notes" of the interview of Wendy Washington that took place on the day of the shooting. Also on November 9, 1993, Hawes filed a "Subpoena for Tangible Evidence Before Trial," directed to the Custodian of Records of the "Baltimore City Police Department, Central Division, Homicide Division," demanding that he or she appear on November 23, 1993, and produce for inspection and copying "Police reports" and "Police follow-up notes in which the Defendant was the subject of the investigation" (or, in lieu of appearing, produce copies of the documents). The State did not produce the August 3, 1993 report in response to the discovery request, and it appears that the requests for subpoenas to produce documents were not granted.

The August 3, 1993 report was in existence prior to the murder trial but was not known to Hawes. The report was discoverable before trial, by the exercise of due diligence, and Hawes, through counsel, diligently attempted to obtain before trial all police reports

33

relating to the shooting, and specifically concerning the interview of Washington by the police. He did not obtain the report because the State did not produce it. Thus, as of the time of trial, the August 3, 1993 report was in existence but was not known to Hawes and also was not available to him. Thus, we disagree with the State that the August 3, 1993 report was not "newly discovered evidence."

As we have explained, however, section 8-301(a)(2) requires a person seeking a writ of actual innocence to claim that there is "newly discovered evidence" that "could not have been discovered in time to move for a new trial under Maryland Rule 4-331." Under Rule 4-331(c), a convicted person who could not with due diligence discover newly discovered evidence in time to file a 4-331(a) ten-day motion may move for a new trial on the basis of newly discovered evidence up to a year after "the date the court imposed sentence or . . . the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment," *whichever comes later*. Here, the later of those two dates is one year after the circuit court received this Court's February 27, 1995 mandate, *i.e.*, March 2, 1996.

Hawes obtained the August 3, 1993 report through a PIA request. He made the PIA request on January 7, 1995, almost two months *before* this Court's mandate issued in his direct appeal. Hawes does not allege in his petition or any of the attached documents *when* he received the documents produced in response to his PIA request. This is a critical date and one that Hawes certainly would know. Moreover, Hawes alleges, *incorrectly*, that under

34

Rule 4-331(c), his opportunity to file a motion for new trial based on newly discovered evidence expired "[b]y February 1995." In fact, as we have explained, his opportunity to file a motion for new trial under Rule 4-331(c) expired on March 2, 1996.

With respect to the August 3, 1993 report, the allegations in the petition pertinent to section 8-301(a)(2) -- that there is newly discovered evidence that could not have been discovered in time for a new trial under Rule 4-331(c) -- are that the report was not known and not available to Hawes before trial; that he obtained the report by making a PIA request on January 7, 1995; and that his right to file a new trial motion based on newly discovered evidence expired in February 1995. As we have explained, the latter allegation is legally incorrect.

There is no allegation in the petition that Hawes could not have filed a motion for new trial under Rule 4-331(c) within the actual deadline for doing so, *i.e.*, by March 2, 1996. Indeed, there is no allegation suggesting or implying that there was any delay by the State in producing the documents in response to Hawes's PIA request. At most, the allegations in the petition imply that Hawes had not received the requested documents, including the August 3, 1993 report, before February 1995. It was incumbent upon Hawes to allege facts in his petition showing that the August 3, 1993 report became known to him after the March 2, 1996 deadline for filing a motion for new trial based on newly discovered evidence. As he did not do so, his petition does not state a claim for writ of actual innocence under section

35

8-301(a), as a matter of law.  Accordingly, the petition properly was dismissed without a hearing.

**ORDER AFFIRMED.  COSTS TO BE PAID BY THE APPELLANT**.