**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2171

September Term, 2012

_____

GARY WARD

v.

STATE OF MARYLAND

Meredith,
Woodward,
Sharer, J. Frederick
    (Retired, specially assigned),

JJ.

Opinion by Meredith, J.

Filed: January 29, 2015

In October 1993, a jury in the Circuit Court for Baltimore City convicted Gary Ward, appellant, of first degree murder and the use of a handgun in the commission of a crime of violence. *See State v. Ward*, 350 Md. 372, 374-75 (1998). Appellant was sentenced to life imprisonment for first degree murder and a consecutive term of five years' imprisonment for the handgun offense.

On January 4, 2012, appellant filed a petition for a writ of actual innocence pursuant to Maryland Code (2001, 2005 Repl. Vol., 2011 Supp.), Criminal Procedure Article ("CP"), § 8-301. Appellant asserted that the State's case against him placed substantial reliance upon expert testimony regarding comparative bullet lead analysis ("CBLA"), and appellant argued that his conviction should be vacated because of scientific studies published in 2002 and 2004 that criticized the use of CBLA in criminal trials.[1] Moreover, appellant argued that the Federal Bureau of Investigation ("FBI") — the only lab in the United States that performed CBLA tests — had discontinued CBLA comparisons in 2005, and the Court of Appeals had declared such testimony inadmissible in 2006 in *Clemons v. State*, 392 Md. 339 (2006). Appellant argued that the new scientific findings about the conclusions that could be reasonably supported by CBLA constituted newly discovered evidence that supported the issuance of a writ of actual innocence granting a new trial pursuant to CP § 8-301. Following a June 14, 2012, hearing, the circuit court denied the petition, and filed a written opinion and order on November 28, 2012. Appellant noted this appeal. While the present appeal was

---

[1] CBLA is sometimes also referred to as compositional analysis of bullet lead ("CABL"). *See United States v. Berry*, 624 F.3d 1031, 1035-36 (9th Cir. 2010).

pending, the Court of Appeals considered another case in which the prosecution had relied on expert testimony regarding CBLA, and the Court of Appeals granted a new trial in that case as a consequence of issues regarding the CBLA evidence. *Kulbicki v. State*, 440 Md. 33 (2014), *reconsideration denied, id.*

## QUESTION PRESENTED

Appellant presents one issue for our review:

Did the lower court err by failing to recognize that national scientific studies, released in 2002 and 2004, followed by the FBI's official rejection and discontinuation of comparative bullet lead analysis (CBLA) in 2005 constitute newly discovered evidence under [CP] § 8-301?

For the reasons stated below, we conclude that the court erred in ruling that the reports were not newly discovered evidence. We vacate the judgment of the circuit court and remand the case for further consideration in light of the Court of Appeals's opinion in *Kulbicki*.

## FACTS AND PROCEDURAL HISTORY

At approximately 11:30 p.m. on September 30, 1992, Alfred Stewart was shot to death in the 1400 block of Cliftview Avenue in Baltimore.[2] *Ward*, *supra*, 350 Md. at 374. In the following days, anonymous callers reported to police that appellant had murdered Stewart. *Id.* at 374. On October 3, police questioned appellant. *Id.* Although appellant was not

---

[2] We note that Stewart's last name is sometimes spelled "Stuart" in the parties' briefs and in the trial transcript. We will use the spelling that was utilized in the Court of Appeals's published opinion. *See Ward*, *supra*, 350 Md. at 374.

charged with the murder at that point, the police impounded appellant's vehicle due to expired tags. *Id.* After a witness identified appellant from a photographic array as Stewart's killer, police obtained a warrant to search appellant's home and vehicle. *Id.* Police recovered three .357 caliber "MAG" hollow point cartridges from the trunk of the vehicle. *Id.* The murder weapon was never found. Appellant was charged with first degree murder and the use of a handgun in the commission of a crime of violence. *Id.*

The circuit court conducted a jury trial in October 1993, with the Honorable Elsbeth Bothe presiding. At trial, the State presented CBLA evidence in an effort to link the bullet fragments found in Stewart's body to the unfired cartridges recovered from appellant's vehicle. In the prosecutor's opening statement, he told the jury that the FBI analysis would show that the bullet that killed Stewart "came from the same lot as those bullets that were found in defendant's car, the same exact make of bullets from the same lot." An FBI agent, Ernest Peele, testified that the composition of the fragments was the same as that of the bullets from appellant's car. The agent stated: "It has the same amount of all the elements present and as such it is consistent with coming from the same source of ammunition."

Agent Peele's testimony about CBLA included the following assertions:

> If comparing two pieces [of bullets] and they have the same composition, the reasonable place to expect that they originated would be from the same homogenous source.

> For instance, they could be from the same piece. **They could be from the same bullet** if you were to take any two small pieces.

3

**The next reasonable place** would be via the manufacturer's packaging process, **would be the same box of ammunition**. **That would be the reasonable place or source of determination to occur.**

And then it is possible the same type, the same manufacturer packaged on or about the same date because obviously the source could be larger than what would be used in a box.

(Emphasis added.)

During closing arguments at appellant's trial, the prosecutor argued to the jury that, based upon Agent Peele's CBLA testimony, they could find a connection between appellant and the bullets taken from Stewart's body:

We also know that the bullets were recovered from Alfred [Stewart]'s body match the cartridges, which means the bullet and the casing that it was in, that was found where? In the Defendant's car. That's a little bit more than coincident, ladies and gentlemen, in light of the fact that you have also have an eyewitness testimony. Got some strong evidence in this case.

The prosecutor emphasized the connection that had been proved by the CBLA evidence which purportedly showed that the bullets that killed Stewart came from the same box as the bullets found in appellant's car. The prosecutor stated:

This stuff was found right inside the trunk. A box of Winchester Super-X cartridges, silver tip, 357 magnum. Just so happens that the same kind of cartridges that were found. Just so happens that they are consistent with the bullets that are recovered from Al [Stewart]. In fact, **not only consistent, but they match. They match from the same source. They came from the same box.**

. . . The testimony of the ballistics experts in here may have, on first blush, appeared to be complicated, but one thing that **we know that there was a connection between** Al [Stewart]'s murder weapon and **the bullet that killed him, and what was found in the Defendant's car. That's a fact. That's a fact.**

4

(Emphasis added.)

The State also presented the testimony of Mohammed Taylor, who was familiar with both appellant and Stewart. Taylor testified that, around midnight on September 30, 1992, he saw appellant and Stewart arguing about drugs which Stewart had recently purchased from appellant. A short time after that, Taylor stated, he heard a gunshot, and he turned around. He testified that he heard two more gunshots and saw Stewart on the ground, and saw appellant running away, holding a gun. Taylor later identified appellant in a photo array.

Alan Wise also testified for the State. At the time of trial, Wise was serving a sentence for an unrelated charge. Wise stated that he had known appellant for a long time. Wise testified that he witnessed appellant fire a silver gun during an unrelated incident that occurred on September 17, 1992. Additionally, Wise stated that, shortly before the September 30 shooting of Stewart, appellant told Wise that he needed money and that he "don't want to have to put the gun to nobody mouth . . . ." Wise testified that he was in the vicinity of the September 30 shooting and heard gunshots, but he did not see anything. Appellant represents in his brief: "Wise has since recanted his testimony in postconviction proceedings [in 2003, at which time Wise testified] that his identification of Gary Ward as the shooter at the earlier incident was a lie." (The State points out, however, that the postconviction judge discounted Wise's recantation as not being credible.)

At appellant's trial, the State also presented expert ballistics testimony that the bullets recovered from the September 17 shooting were fired by the same caliber of gun as the bullet fragments found in Stewart's body.

Everett Johnson, who lived in the neighborhood and had known appellant for seven years at the time of the shooting, testified on behalf of appellant. Johnson stated that, on the night of September 30, he was talking on the phone when he heard gunshots. He went outside and saw a man standing over another man. Johnson stated that the standing man turned, saw him, and departed. Johnson testified that he did not know the man he saw standing over the body, but it was *not* appellant. Although Johnson observed the unknown man standing over Stewart's body within seconds after hearing the shots fired, Johnson acknowledged that he did not see the shooting.

Appellant's mother and stepfather both testified that appellant was at home watching television at the time of the shooting. Appellant also testified in his case and he denied shooting Stewart. Appellant admitted asking Stewart for money, but denied threatening him. Appellant testified that he had permitted other people to drive his car and did not know anything about the bullets found in the trunk. Appellant professed his innocence, and testified as follows:

Q    [DEFENSE COUNSEL] Sir, you know that you're charged with shooting Mr. [Stewart].

A.    [GARY WARD] Yes, sir.

Q.    Did you in fact shoot Mr. [Stewart] on September the 30th, 1992?

6

[PROSECUTOR]: Objection to the leading nature of the question.

THE COURT: Well —

A. No, I did not shoot Alfred [Stewart].

The jury convicted appellant of first degree murder and the use of a handgun in the commission of a crime of violence. On appeal, in an unreported decision, this Court rejected the arguments asserting error by the trial court, but remanded the case with instructions to hold a suppression hearing concerning the search of the vehicle. *Ward v. State*, No. 69, Sept. Term 1994 (filed November 9, 1994). On remand, the circuit court denied the motion to suppress.

Appellant appealed to this Court a second time. In an unreported decision, we reversed the denial of his motion to suppress and stated: "[W]e are constrained to vacate appellant's convictions." *Ward v. State*, No. 297, Sept. Term 1996 (filed January 7, 1997). (*See State v. Ward*, 350 Md. at 410-11.) The Court of Appeals, however, reversed this Court's ruling, and ordered that appellant's convictions be affirmed. *State v. Ward*, *supra*, 350 Md. at 389-90.

In April 2003, appellant filed a petition for postconviction relief, which was denied after a hearing. The circuit court also denied his motion to reconsider the denial of his petition for postconviction relief.

On January 4, 2012, appellant filed a petition for a writ of actual innocence pursuant to CP § 8-301. Appellant argued that newly discovered evidence — the scientific studies

7

published in 2002 and 2004 and the FBI's 2005 change in policy — called into question the validity of the conclusions that had sometimes been drawn from CBLA reports by expert witnesses such as Agent Peele. Appellant pointed out that the FBI had ceased performing CBLA comparisons in 2005. Appellant asserted that these scientific studies would have rendered the CBLA evidence inadmissible at his trial or, at least, generated a substantial possibility of a different result, and he requested a new trial.

On June 14, 2012, the circuit court conducted a hearing on appellant's petition. Due to the passage of time, the judge who presided over appellant's trial was no longer available, and his petition was heard by a different judge. At the hearing, counsel for appellant argued that the studies published after his trial should be considered newly discovered evidence, stating, in part:

> [At the time of appellant's trial,] the scientific community [relative to CBLA] consisted of two people in the FBI.
>
> Because of this closed-world environment, no one had the knowledge to be able to challenge it in a court of law. When [the 2002 and 2004 reports] became available, that's when — at that moment, attorneys were able to look at it and say, wait a minute.
>
> There are statistical errors in here. Wait a minute[;] there are times that a bullet from 1998 could be exact[ly] like a bullet from 1996. Up until that time, nobody knew it. And it wasn't until the science world was allowed in by the FBI that attorneys were able to finally challenge CBLA. That's the point that we're trying to make.
>
> THE COURT: Okay.

8

[COUNSEL FOR APPELLANT]: So, because it was — it was new to us after this study, and none of that was available to Mr. Ward at the time [of his trial], so he couldn't challenge it.

THE COURT: So — and you're saying that, if he had been — if he had been able to use the newly discovered evidence, challenging the CBLA, the jury would have disregarded the CBLA, and that he would have been found — the result may — would have — there's a substantial likelihood that the result would have been different; is that what you're telling me?

[COUNSEL FOR APPELLANT]: Close. I'm saying, Your Honor, that a judge in [a] Frye-Reed hearing would never allow CBLA — it certainly wouldn't be allowed today under [*Clemons v. State*, 392 Md. 339 (2006)] — it would never get to the jury. The jury would never be able to hear CBLA.

On November 28, 2012, the circuit court filed an opinion and order denying appellant's petition. The court determined that the 2002 and 2004 studies were "merely impeaching" evidence relative to the expert's testimony at appellant's trial, citing *United States v. Berry*, 624 F.3d 1031, 1043 (9th Cir. 2010), and *United States v. Higgs*, 663 F.3d 726, 743 (4th Cir. 2011). Citing our opinion in *Kulbicki v. State*, 207 Md. App. 412, 438 (2012), the circuit court also noted that the Court of Appeals's rejection of CBLA evidence in *Clemons v. State*, 392 Md. 339 (2006), had been framed as an evidentiary issue which did not have retroactive application. The court further observed that, even if it considered the studies to be newly discovered evidence, appellant had failed to meet his burden of showing a substantial possibility that the jury would have reached a different result at his trial. Appellant noted this appeal.

9

**STANDARD OF REVIEW**

In order to prevail on a petition for a writ of actual innocence, appellant had the burden to persuade the circuit court that the scientific studies are newly discovered evidence that could not have been discovered in time to move for a new trial under Maryland Rule 4-331, and that this newly discovered evidence creates a substantial or significant possibility that the result at his trial "may have been different." *See Hawes v. State,* 216 Md. App. 105, 133 (2014). Appellant argues that the circuit court committed an error of law in failing to classify the 2002 and 2004 scientific studies as newly discovered evidence, and by incorrectly applying the standard of whether that evidence would have created a substantial possibility that the result of the trial may have been different. *See Campbell v. State,* 373 Md. 637, 668 (2003). Although trial courts have broad discretion in ruling upon the admissibility of evidence, we review *de novo* any "pure legal question" regarding evidence. *See Mathews v. Cassidy Turley Md., Inc.*, 435 Md. 584, 599 (2013) (citing *Hall v. Univ. of Md. Med. Sys. Corp.*, 398 Md. 67, 82 (2007)).

In *Douglas v. State*, 423 Md. 156, 188 (2011), the Court of Appeals stated: "[D]ecisions on the merits of requests for new trials based on newly discovered evidence, whether filed pursuant to Rule 4-331 or [CP] § 8-301, are committed to the hearing court's sound discretion." *See also Campbell, supra*, 373 Md. at 665; *Jackson v. State*, 216 Md. App. 347, 363-64 (2014). Accordingly, we review a circuit court's ruling upon the merits of a petition for a writ of actual innocence for an abuse of discretion. *See Keyes v. State*, 215 Md.

10

App. 660, 670 n.6 (2014). Whether the circuit court applied the correct standard in making its evaluation is a legal question we review *de novo*. *See Thompson v. State*, 411 Md. 664, 683 (2010) (court's application of incorrect standard required remand for reconsideration under the appropriate standard). *Cf. State v. Seward*, 220 Md. App. 1, 23-24, 102 A.3d 798, 812 (2014) (reversing grant of writ of actual innocence because of "the imposition by the court below of the wrong standard"); *Hawes, supra*, 216 Md. App. at 133 (reviewing allegations in petition for legal sufficiency *de novo*, and ruling as a matter of law, 216 Md. App. at 134-35, that errors in jury instructions could not constitute newly discovered evidence).

## DISCUSSION

**History of CBLA Evidence**

From the late-1960s until 2005, the FBI conducted CBLA to compare bullets found at crime scenes to bullets found in a defendant's possession. *Higgs, supra*, 663 F.3d at 736. CBLA was based on the now-debunked theory that each batch of lead used to produce bullets was unique at an elemental level. *Id.* This invalid theory resulted in expert witnesses from the FBI testifying that, because each batch of lead was unique, CBLA could establish with a reasonably degree of scientific certainty that two bullets were from the same batch. *See Berry, supra,* 624 F.3d at 1035 n.3. The introduction of CBLA evidence at trial enabled prosecutors to argue that, if a bullet recovered from a crime scene matched the composition of a bullet in a suspect's possession, then it was more likely that the suspect fired the bullet

11

found at the crime scene. *Id.* at 1035-36 (citing Commission on Sci. Assessment of Bullet Lead Elemental Compositional Comparison, NRC, *Forensic Analysis: Weighing Bullet Lead Evidence*, at 1-2 (2004) ("the NRC Study"), *available at* http://www.nap.edu/catalog.php?record_id=10924).

Doubts existed in the scientific community, however, regarding the reliability and accuracy of the CBLA comparisons, as well as the inferences that could be reasonably drawn from the analysis. In 1991, at the International Symposium on the Forensic Aspects of Trace Evidence, experts in the field issued a report that "'cautioned that the variability (of the elemental mix) within a production run . . . has not been addressed in a comprehensive study.'" *Clemons*, 392 Md. at 368 (quoting Edward J. Imwinkelried & William A. Tobin, *Comparative Bullet Lead Analysis (CBLA) Evidence: Valid Inference or* Ipse Dixit*?*, 28 OKLA. CITY U. L. REV. 43, 50 (Spring 2003)).

In *Kulbicki*, 440 Md. at 49 *et seq.*, the Court of Appeals discussed the 1991 report, and noted that Ernest Peele — the same CBLA expert who testified at appellant's trial in 1993 — was one of the authors of the report (referred to in *Kulbicki* as "the 1991 Peele Report"). Because the 1991 Peele Report was "distributed to various public libraries in 1994," *id.* at 52 n.12, and was theoretically available to the general public at the time of Kulbicki's trial in 1995, the Court of Appeals held that, "[h]ad Kulbicki's attorneys investigated and discovered the 1991 Peele Report, they would have had a potent challenge to Agent Peele's conclusion that the bullet fragment taken from the autopsy and the fragment found in

12

Kulbicki's truck was 'what you'd expect if you were examining two pieces of the same bullet.'" *Id*. at 52. The Court held that the failure of Kulbicki's trial counsel to utilize the 1991 Peele Report in cross-examining Agent Peele was the result of ineffective assistance of counsel. The Court explained, *id*. at 53:

> Kulbicki's attorneys' failure to appropriately investigate the 1991 Peele Report and to challenge the State's scientific evidence on cross-examination at trial, thus, fell short of prevailing professional norms. Given the serious nature of the charges Kulbicki was facing, along with the fact that CBLA was so persuasively used to connect Kulbicki to the alleged murder scene and murder weapon, it was incumbent on Kulbicki's attorneys "to subject the state's theories to the rigors of adversarial testing". *See Driscoll*, 71 F.3d at 709. Having failed to research what Agent Peele had published about the forensic evidence about which he was testifying and having also failed to conduct an adequate cross-examination rendered Kulbicki's counsels' performance inadequate.

Further, the Court of Appeals held that, if Agent Peele had been effectively cross-examined, there was a substantial possibility the result of the trial would have been different:

> Given the State's rigorous reliance on CBLA evidence to connect Kulbicki to the crime, we conclude that there was a "substantial possibility" that the outcome would have been different had Kulbicki's counsel questioned Agent Peele regarding the possibility of having compositionally similar bullets exist in different batches. Having concluded that both prongs of *Strickland* [*v. Washington,* 466 U.S. 668, 687 (1984)] have been satisfied, we hold that the Circuit Court erred in concluding that Kulbicki's attorneys had not rendered ineffective assistance of counsel, and thus, remand for a new trial.

*Id*. at 56 (footnotes omitted).

Appellant's petition in the present case was based upon two studies published after his trial, both of which were more critical of the FBI's use of CBLA than the 1991 Peele Report had been. In 2002, a study examined the metallurgical phenomena that occur during

13

lead refining and bullet manufacturing. *Clemons, supra*, 392 Md. at 368. This study

concluded that it was possible that bullets produced in the same lot could be chemically

different, but also concluded that bullets produced at different times could be compositionally

identical. *Id.* (citing E. Randich *et al.*, *A Metallurgical Review of the Interpretation of Bullet

*Lead Compositional Analysis*, 127 FORENSIC SCI. INT'L 174, 182 (2002) ("the Randich

Study")).

At the request of the FBI, the National Research Council ("NRC") conducted another

study of CBLA evidence. *Berry*, *supra*, 624 F.3d at 1037. In 2004, the NRC published its

results. The NRC Report was critical of some of the practices of the FBI. *Id.* For example,

the report noted that the FBI was "overstating some of the conclusions that could be drawn

from CBLA evidence." *Id.* (citing NRC Study, *supra*, at 6-7). The NRC determined that

"[v]ariations among and within lead bullet manufacturers make any modeling of the general

manufacturing process unreliable and potentially misleading in [CBLA] comparisons[,]" but

nevertheless, "[CBLA] is sufficiently reliable to support testimony that bullets from the same

compositionally indistinguishable volume of lead (CIVL) are more likely to be analytically

indistinguishable than bullets from different CIVLs." NRC Study, *supra*, at 112.

As this Court observed in *Kulbicki*:

The NRC report demonstrates that the problem with CBLA is not that the
*method* used to *compare* the contents of two bullets is unreliable in some
abstract sense, but that it is unreliable to conclude that a CBLA "match"
supports *further specific factual assertions put forth at trial*. Most often, these
assertions are that matching bullets came from the same box, the same
manufacturer, were related in time or geography, or generally linked the

14

defendant to the crime in some unspecified manner. Crucially, these conclusions rested on assumptions unsupported by scientific and statistical testing of the general bullet *manufacturing* process. *See* Nat'l Res. Council at 112–13. First, the NRC found that a CBLA match supports the inference that two bullets came from the same "source" when taken to mean a compositionally indistinguishable volume of lead ("CIVL"). But there was no generally reliable evidence that a CBLA match corresponded to a match among any other type of "source," such as a specific manufacturer, box, time, location, etc. *See id.* at 106–07. Thus, it remained in many cases a distinct possibility that while bullets from the same "source" match each other, they also match bullets from any number of "sources." Second, there was no general knowledge of the probability that manufacturing variations would result in two different lead sources randomly producing matching bullets, producing what is known as a "false positive." *Id*. at 107 ("Although it has been demonstrated that there are a large number of different [CIVL's], there is evidence that bullets from different CIVL[']s can sometimes coincidentally be analytically indistinguishable.").

*Kulbicki v. State*, 207 Md. App. 412, 439-40 (2012) (internal footnote omitted), *rev'd*, 440 Md. 33 (2014).

In 2005, the FBI announced that it would no longer use CBLA comparisons in criminal prosecutions. *Berry*, *supra*, 624 F.3d at 1037.

**Appellant's Petition**

The statute that created the writ of actual innocence — CP § 8-301 — states, in pertinent part:

(a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:

(1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and

15

(2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

* * *

(g) A petitioner in a proceeding under this section has the burden of proof.

A petition for a writ of actual innocence must also comply with Maryland Rule 4-332.

Appellant contends that the Randich Study and NRC Report criticizing CBLA evidence constitute newly discovered evidence which could not have been discovered within the one-year time limit for him to move for a new trial pursuant to Maryland Rule 4-331. Appellant asserts that the availability of this new evidence creates a significant possibility that the result of his trial may have been different. Appellant points out that the FBI discontinued CBLA comparisons in 2005, and the Court of Appeals, in *Clemons*, rejected the use of CBLA evidence in trials in Maryland. Accordingly, appellant argues, if he had been able to use the evidence of the studies at trial, he could have precluded Agent Peele from testifying that CBLA evidence provided a link between the bullets used in Stewart's murder and the unspent bullets found in the trunk of appellant's car. Appellant contends that, without the CBLA testimony that was used to connect him to the murder weapon, there is a substantial possibility that the jury may have reached a different result.

The State counters that the circuit court properly rejected appellant's petition. The State contends that the Randich Study and NRC Report are not newly discovered evidence as that term has been judicially defined, and further, that the studies would merely impeach the expert's testimony at trial. Additionally, the State points out that appellant's proffered

16

newly discovered evidence does not tend to establish appellant's innocence. Alternatively, the State argues that, even if the studies do constitute newly discovered evidence, there is not a significant possibility that the jury would have reached a different result.

Based on a comment we made in *Keyes v. State*, the State also asserts that new scientific analyses do not qualify as newly discovered evidence. In *Keyes*, this Court considered a petition for a writ of actual innocence in which the petitioner alleged that he had found newly discovered evidence in the form of reports and documents written after his trial. 215 Md. App. at 664-65. Among other reasons we gave for denying relief, we said that these reports did not constitute newly discovered evidence because, "[e]ven if we assume the authenticity, accuracy, and truthfulness of those reports, it is clear that those events took place after appellant was convicted and sentenced. They could have had no effect on his trial, and, thus, do not qualify as 'newly discovered evidence.'" *Id.* at 671 (citing *United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993) (noting that newly discovered evidence allowing for grant of a new trial must have been in existence at time of trial)). *See also Commonwealth v. LeFave*, 714 N.E.2d 805, 813 (Mass. 1999).

But we are persuaded that a different rule applies to later discovered scientific evidence which casts doubt upon the validity and admissibility of evidence that was introduced at the time of trial. Courts in other states have recognized that "newly discovered evidence" can include "new testing methods or techniques that did not exist at the time of trial, but are used to test evidence introduced at the original trial." *Wyatt v. State*, 71 So. 3d

17

86, 100, 92 A.L.R.6th 725 (Fla. 2011) (2008 letter from FBI acknowledging problem with its agent's CBLA testimony at 1991 trial constituted newly discovered evidence even though not in existence at time of trial. The Florida Supreme Court stated: "[W]e hold that the case-specific letter authored by the FBI in this case constitutes newly discovered evidence because the letter consists of facts that [the defendant] could not have known at the time of trial, and [the defendant] or defense counsel could not have known of the facts by the use of diligence."). *Accord State v. Behn,* 375 N.J. Super. 409, 429, 868 A.2d 329, 343 (App. Div. 2005) (In a postconviction challenge to CBLA evidence raising the studies published after defendant's trial, the court stated: "There is no doubt that the information at issue, the results of the studies by Randich, Tobin and others, was newly discovered since it was not developed until after defendant's trial. Clearly, such new scientific evidence may constitute newly discovered evidence."). *Cf.* Maryland Rule 4-331(c)(3), providing for relief "on the ground of newly discovered evidence" consisting of DNA testing without regard to whether such evidence was in existence at the time of trial. Similarly, a credible confession by a third party would be evidence that did not exist at time of trial, but could constitute newly discovered evidence. *Casias v. United States*, 337 F.2d 354, 356 (10th Cir. 1964) ("No one can doubt that a confession by another party to the crime for which the petitioner has been tried and convicted, if discovered after conviction, would be grounds for a new trial.").

Since the date of oral arguments in this case, the Court of Appeals issued its opinion in *Kulbicki v. State*, 440 Md. 33 (2014). The Court of Appeals reversed our decision — that

18

would have denied postconviction relief, *see Kulbicki v. State*, 207 Md. App. 412 (2012) —

and decided that Kulbicki was entitled to a new trial based upon a CBLA issue that had not

even been briefed. 440 Md. at 40. The Court of Appeals held that Kulbicki's trial counsel

had provided ineffective assistance by failing to cross-examine the State's CBLA expert (the

same Ernest Peele who testified at appellant's trial) regarding a report he co-authored in

1991. The fact that the Court of Appeals placed such importance on a 1991 report that was

only a partial acknowledgment of a possible weakness in using CBLA evidence at trials

persuades us that, in the present case, the circuit court gave inadequate weight to the potential

impact the 2002 and 2004 studies could have had on the outcome of appellant's trial.

*Clemons*

In 2006, in *Clemons*, the Court of Appeals considered whether CBLA had attained

sufficient acceptance within the scientific community for such evidence to be admitted

pursuant to the *Frye-Reed* test.[3] 392 Md. at 343-44. In *Clemons*, a man had been murdered

in Prince George's County. *Id.* at 344. A few days after the murder, police in Washington,

D.C., recovered a gun and bullets from a vehicle involved in a traffic accident. *Id.* Police

---

[3] The *Frye-Reed* test refers to the standard for the admissibility of scientific testimony as adopted in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and adopted in Maryland by *Reed v. State*, 283 Md. 374 (1978). The Court of Appeals stated in *Clemons, supra,* 392 Md. at 364: "'[T]he proper test for establishing the reliability of scientific opinion is whether the basis of that opinion is generally accepted as reliable within the expert's particular scientific field.'" *Id.* at 364 (quoting *Wilson v. State*, 370 Md. 191, 201 (2002)). Under this test, a court may either take judicial notice of a scientific process's reliability or unreliability or hear testimony before determining the reliability or unreliability of a scientific process. *Clemons*, *supra*, 392 Md. at 363-64 (citing *Wilson, supra,* 370 Md. at 201).

determined that the gun recovered from the vehicle was consistent with the one used in the murder in Maryland, but police could not conclusively prove that it was the murder weapon. *Id.* at 345. An eyewitness to the murder, however, identified Clemons in a photographic array as the shooter. *Id.* Prior to trial, Clemons filed a motion *in limine* to exclude the expert testimony of Charles Peters, a forensic chemist at the FBI, who would present CBLA evidence purporting to link the bullets recovered from the D.C. traffic investigation with those found at the scene of the murder. *Id.* at 347. The court reserved ruling on the motion until trial. *Id.*

At trial, Clemons challenged the admissibility of the CBLA evidence as scientifically unreliable. *Id.* at 348-49. After the State's CBLA expert had been examined on voir dire, the trial court agreed to accept Peters as an expert in the field of CBLA. Peters testified about CBLA comparisons generally and his conclusions in Clemons's case. *Id.* at 349-54. Clemons presented his own expert, William Tobin, a retired FBI metallurgist, who had conducted studies of CBLA evidence, and was one of the authors of the 2002 Randich Study. *Id.* at 368. Tobin testified that CBLA evidence was unreliable and based his conclusions on the results of the Randich Study. *Id.* at 354-57. The jury convicted Clemons of second degree murder and the use of a handgun in the commission of a felony. *Id.* at 357. Because Clemons failed to renew his objections when the opinion questions were posed to the State's expert at trial, this Court held that Clemons's challenge to the CBLA testimony was not preserved for appellate review. *Id.* at 357-58.

The Court of Appeals, however, reversed, and held that CBLA evidence was not admissible under the *Frye-Reed* test. The Court reviewed the findings of the 2002 Randich Study and the 2004 NRC Study and concluded: "[I]t is clear that a genuine controversy exists within the relevant scientific community about the reliability and validity of CBLA." *Id.* at 371. The Court stated: "We conclude that CBLA does not satisfy the requirement under the *Frye-Reed* test for the admissibility of scientific expert testimony because several fundamental assumptions underlying the process are not generally accepted by the scientific community." *Id.* at 372. The Court held that the trial court committed a reversible error in admitting the CBLA testimony, and remanded for a new trial. *Id.*

**Subsequent Application of *Clemons***

In addition to appellant's arguments that the 2002 and 2004 reports constituted newly discovered evidence, appellant argued that the court should have granted his petition and ordered a new trial because the Court of Appeals's holding in *Clemons* should be applied retroactively. Further, appellant points to a case from the Superior Court of New Jersey as support for the proposition that the Randich Study and NRC Study render suspect any conviction based in part on CBLA evidence. *See Behn, supra*, 375 N.J. Super. 409, 868 A.2d 329. The State responds that *Clemons* applies prospectively only because it was based on an evidentiary issue and is not entitled to retroactive application.[4]

---

[4] Although the Superior Court of New Jersey held that due process required that its ruling rejecting CBLA evidence should be applied retroactively, *see Behn, supra*, 375 N.J. Super. at 429-33, 868 A.2d at 343-46, other courts have denied postconviction relief for

21

*Kulbicki*

In *Kulbicki*, 207 Md. App. at 436-37, we considered the circuit court's denial of Kulbicki's petition for relief pursuant to the Uniform Postconviction Procedure Act ("UPPA"). CP § 7-101 *et seq.* Kulbicki argued that his conviction was obtained in violation of his due process rights because it was based, in part, on CBLA evidence similar to that which had been declared inadmissible in *Clemons*. We concluded in *Kulbicki* that the Court of Appeals's holding in *Clemons* was premised on an evidentiary ruling, rather than a due process concern. We stated: "The *Clemons* Court, however, did not determine whether admission of CBLA evidence in cases prior to 2006 constituted a violation of *due process*.

various reasons, generally in jurisdictions in which the threshold for relief is higher than it is under CP § 8-301. *See, e.g., Higgs, supra*, 663 F.3d 726, 740-42 (noting that CBLA evidence merely corroborated other evidence of guilt), *cert. denied*, ___ U.S. ____, 133 S. Ct. 787 (2012); *Berry, supra*, 624 F.3d at 1039-42 (finding no due process violation in admission of CBLA testimony); *Wyatt v. State*, 78 So. 3d 512, 527-28 (Fla. 2011) (finding that CBLA studies constituted newly discovered evidence but affirming denial of relief because the standard in Florida required the defendant to persuade the postconviction court that "this newly discovered evidence is of such a nature that it 'would probably produce an acquittal on retrial'"); *St. Clair v. Commonwealth*, ___ S.W.3d ____, 2014 WL 4113014 (Ky. 2014) (there was no "reasonable certainty" the verdict would be different if CBLA evidence was excluded at new trial); *Ragland v. Commonwealth*, 191 S.W.3d 569, 580 (Ky. 2006) (rejecting CBLA under *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)], but not finding a due process violation); *Scott, supra*, 788 N.W.2d at 502 (Minn. 2010) (finding that studies discrediting CBLA evidence "[d]id not establish, by the clear and convincing standard, [defendant's] innocence"); and *Commonwealth v. Fisher*, 870 A.2d 864, 870-72 (Pa. 2005) (defendant's evidence of CBLA studies did not "establish, by a preponderance of the evidence . . . that such evidence would likely compel a different result"). *See generally* Fern L. Kletter; Annotation, *Use and Effect of Comparative Bullet Lead Analysis (CBLA) in Criminal Cases*, 92 A.L.R.6TH 549 (2014). *Cf. Yorke v. State*, 315 Md. 578, 588 (1989) (the threshold for relief in Maryland is whether there is "a substantial or significant possibility that the verdict of the trier of fact would have been affected").

*Clemons* addressed an evidentiary issue and, thus, applied only *prospectively* to cases to be heard at the trial level." *Id.* at 438 (internal footnote omitted).

As noted above, the Court of Appeals based its grant of a new trial in *Kulbicki* upon its conclusion that the failure to cross-examine Agent Peele with the 1991 report he co-authored was ineffective assistance of counsel, and that deficient performance of counsel "created a 'substantial possibility' that, but for counsel's errors, the outcome may have been different." 440 Md. at 54.

Although *Kulbicki* addressed a claim for postconviction relief pursuant to UPPA rather than a petition for a writ of actual innocence, we view the holding of the Court of Appeals, and its treatment of CBLA evidence, as instructive with respect to significance of the CBLA testimony in appellant's case. In both cases, the prosecution argued that the CBLA evidence was the product of a scientific process that provided a critical link between the defendant and the murder. The Court of Appeals observed that, at Kulbicki's trial, the prosecutor's closing argument had "relied on forensic evidence to connect Kulbicki to the homicide," 440 Md. at 55, and the Court stated, *id.*:

> We have frequently recognized the significance jurors afford to forensic evidence in assessing a defendant's guilt or innocence. *See Clemons*, 392 Md. at 347 n.6, 896 A.2d at 1064 n.6 (noting that "jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials", quoting *Reed v. State*, 283 Md. 374, 386, 391 A.2d 364, 370 (1978)). The importance of the CBLA evidence to the instant matter, moreover, cannot be overstated. Agent Peele testified that the bullet fragments found in Kulbicki's truck and in the victim were "what you'd expect if you were examining two pieces of the same bullet . . . two pieces of the same source". Likewise, Agent Peele testified that an unfired cartridge taken from

23

Kulbicki's handgun, while not analytically indistinguishable from the bullet taken from the victim's autopsy, was "unusually close in that that's not what you'd expect, unless there's some association between the two groups."

As in *Kulbicki's* case, Agent Peele's CBLA testimony was relied upon by the prosecutor in appellant's case to connect him to the fatal bullets. Consequently, the evidence that did not become available to appellant to challenge the admissibility of the CBLA testimony until 2002-2005 was not "merely impeaching," but instead, directly contradicted part of the State's substantive evidence that was relied upon to connect appellant to Stewart's murder. As we explained in *Jackson v. State*, 164 Md. App. 679, 697-98 (2005), evidence that impeaches a witness regarding a collateral point "that did [not] go to the core question of guilt or innocence . . . would offer peripheral contradiction and would, therefore, be 'merely impeaching.'" But, we explained, evidence attacking the merits of inculpatory testimony should not be dismissed as "merely impeaching," even if it happens to be "coincidentally impeaching." *Id.* at 698. We stated: "If the newly discovered evidence, on the other hand, was that the State's witness had actually testified falsely on the core merits of the case under review, that evidence, albeit coincidentally impeaching, would be directly exculpatory evidence on the merits and could not, therefore, be dismissed as 'merely impeaching.'" *Id.*

Here, the proffered new evidence was such a "potent challenge to Agent Peele's conclusion[s]," *Kulbicki, supra*, 440 Md. at 52, that Agent Peele would have been precluded from testifying at appellant's trial. He would not have been merely impeached. He would

24

have been disqualified from providing inculpatory evidence that the State relied upon to connect appellant to the murder weapon. If appellant had been able to confront Agent Peele with the 2002 and 2004 reports that were used in *Clemons*, the trial court would have been obligated to totally exclude the incriminating CBLA evidence. Consequently, the circuit court erred in concluding that the 2002 and 2004 studies were "merely impeaching."

Furthermore, although the petition judge, in ruling on appellant's petition, rendered an alternative ruling that the new evidence was unlikely to have led to appellant's acquittal, we are not persuaded that the court would have come to the same conclusion if the Court of Appeals's guidance in *Kulbicki* had been available. In *Yonga v. State,* ___ Md. App. ____, No. 2441, September Term, 2013 (filed January 28, 2015), Judge Moylan explained that, "[i]n every newly discovered evidence case, . . . there is a universally recognized procedure for measuring the persuasive weight of [the] newly discovered evidence." Slip op. at 22. That test, sometimes described as the "before and after" test, is:

> We first look at the evidence of guilt before the jury at the trial that led to the conviction. We then look at the newly discovered evidence. The acid test is to ask whether, if that jury had had the benefit of the newly discovered evidence as well as the evidence that was before them, would there be "a substantial or significant possibility that the result would have been different?"

*Id*.

Although the circuit court stated at the time of denying appellant's petition that it "[could not] conclude that there is substantial possibility that the repudiation of CBLA would have resulted in [appellant's] acquittal," the court did not have the benefit of the Court of

25

Appeals's guidance set forth in *Kulbicki*, where the Court of Appeals stated: "The importance of the CBLA evidence . . . cannot be overstated." 440 Md. at 55. As we noted above, the Court held in *Kulbicki* that, given the State's reliance upon CBLA evidence to connect the defendant to the crime, "there was a 'substantial possibility' that the outcome would have been different," 440 Md. at 56, if defense counsel had merely cross-examined Agent Peele about the report he had co-authored. If mere cross-examination of Agent Peele would have created a substantial possibility of a different outcome, it follows that total exclusion of Agent Peele's testimony (pursuant to *Clemons* as a result of the 2002 and 2004 studies) would also have created a possibility of a different outcome.

Because the decision of whether appellant should be granted a new trial is committed to the discretion of the circuit court judge, *Douglas, supra*, 423 Md. at 188, *Thompson, supra*, 411 Md. at 683, we will vacate the judgment of the circuit court and remand the case for further consideration in light of the Court of Appeals's ruling in *Kulbicki*.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED FOR FURTHER CONSIDERATION. COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**