**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2126

September Term, 2014

_____

ROBERT AMOS PATTERSON

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Arthur,
Kenney, James A., III
   (Senior Judge, Specially Assigned),


JJ.
_____

Opinion by Arthur, J.
_____

Filed:  September 27, 2016

Robert Amos Patterson, an inmate representing himself, appeals from the denial of

a petition for writ of actual innocence, in which he challenged his 1993 convictions for

first-degree murder and related handgun offenses. He raises a single question, which we

have rephrased as follows: Did the circuit court abuse its discretion in denying the

petition for writ of actual innocence on the ground that the unequivocal conclusion by

State's expert on comparative microscopic matching did not create a substantial or

significant possibility that the result at trial may have been different?[1]

Finding no abuse of discretion in the circuit court's denial of the petition, we shall

affirm.

## BACKGROUND

For background, we set forth part of the factual summary from this Court's

unreported opinion in Patterson's direct appeal:

> On July 9, 1992, Rudolph Holland was fatally shot at 49 Clay Street, near
> Annapolis, Maryland. Several witnesses testified that they saw two black
> men, one with dark skin, and the other with lighter skin, either in the area of
> the shooting or running from the scene. Although some were able to
> identify [Patterson] as the man with the lighter skin, either by a photo array
> or in court, some were either unable positively to identify [him], or
> identified someone other than [him] as the man with the lighter skin.
>
> Officer William Hyatt, of the District of Columbia's Metropolitan Police
> Department, was the State's principal witness. Officer Hyatt testified that
> on July 17, 1992, he responded to the area of 24th Street and Benning Road
> in Northeast Washington, D.C., after receiving a report that suspects in
> another shooting were in that area. On arriving at the scene, Hyatt observed
> the three suspects, one of whom was later identified as [Patterson].
> According to Officer Hyatt, [Patterson] and the other men fled, and

---

[1] Patterson phrased his question as follows: "Did the circuit court err in denying appellant's writ for actual innocence on the basis that the ballistics examiner's unequivocal conclusion regarding the murder weapon was a harmless error?"

[Patterson] discarded his gun after removing the bullets from it. [Patterson] was apprehended a short time later and placed under arrest for possession of a handgun. About four months later, [Patterson] was arrested by the Annapolis City Police Department for the Clay Street murder. At trial, a firearms examiner from the Federal Bureau of Investigation ["FBI"] testified that the bullet recovered from the victim of the Clay Street shooting had been from the .38 caliber gun dropped in Washington, D.C., by [Patterson] on July 17th.

[Patterson], as well as several other witnesses for the defense, testified that [he] was at a barbecue in Forestville, Maryland, on July 9th. [Patterson] testified that he did not have a gun with him on July 17th and thus could not have discarded a gun before being arrested.

*Patterson v. State*, No. 1932, Sept. Term 1993, slip op. at 1-2 (filed July 28, 1994) (per curiam).

Although it was not an issue during Patterson's trial or direct appeal, the testimony of the FBI firearms examiner is now the subject of the instant appeal. That examiner, FBI Special Agent Joseph Williamson, testified, without objection, that the bullet recovered from the murder victim, as well as several other bullets recovered from the Annapolis crime scene, had been fired by the .38 caliber handgun that Officer Hyatt had recovered from Patterson, "to the exclusion of any other firearm in the world."

During closing argument, the prosecutor relied upon Special Agent Williamson's unequivocal conclusion that the gun recovered from Patterson definitely fired the fatal shots. He told the jury that "the bullet was fired from this gun to the exclusion of all handguns ever made anywhere in the world"; that "[n]o other gun anywhere in the world could have fired those bullets except that one, that gun that was in the hands of Robert Patterson on July 17th"; and that the silver handgun, found in Patterson's possession

eight days after the Annapolis murder, "definitely fired the bullets that killed Rudolph Holland[.]"

The prosecutor repeated these unequivocal assertions in the rebuttal phase of closing argument. There he told the jury that the "gun was analyzed by the F.B.I. and the bullets were tested by the F.B.I., and there's no doubt that the gun and the bullets that Mr. Patterson had in his hand were fired by that gun, the bullets that killed Mr. Holland." He concluded with the assertion that "[y]ou've got Mr. Patterson in Washington, D.C., in possession of the gun that fired the bullets to the exclusion of all other guns in the world that killed Rudolph C. Holland."

The jury found Patterson guilty of first-degree murder, use of a handgun in the commission of a crime of violence, and use of a handgun in the commission of a felony. The circuit court sentenced Patterson to a term of life imprisonment for first-degree murder and a consecutive term of 20 years' imprisonment for one of the handgun convictions.

In 1993, Patterson filed a motion for new trial on the ground of newly-discovered evidence – an affidavit, executed by an attorney who had investigated his case before trial, which contradicted the testimony of the arresting officer. The circuit court denied his motion, and this Court affirmed in an unreported opinion. *Patterson v. State*, *supra*, No. 1932, Sept. Term 1993. Later, Patterson unsuccessfully pursued post-conviction relief. *Patterson v. State*, No. 25, Sept. Term 1998 (filed June 25, 1998) (per curiam); *Patterson v. State*, No. 1355, Sept. Term 2010 (filed Mar. 24, 2011) (per curiam).

In 2013, Patterson, acting through counsel, filed a petition for a writ of actual innocence. That petition alleged that Patterson's trial had been tainted by the admission of testimony, from Special Agent Williamson, regarding the use of comparative bullet-lead analysis ("CBLA"), a technique that has been determined to be unreliable and inadmissible under the *Frye-Reed* test governing admissibility of scientific evidence in Maryland courts. *Clemons v. State*, 392 Md. 339, 371 (2006). The circuit court dismissed Patterson's petition without a hearing because a review of the trial transcripts led it to determine that Special Agent Williamson "never used CBLA to link the bullets" in Patterson's possession "to the bullets found at the crime scene."

Patterson, acting through the same counsel, filed a second petition for writ of actual innocence, which is the subject of the instant appeal. In that petition, Patterson challenged the State's use of firearms identification evidence, which, as characterized by Special Agent Williamson, is "a comparative microscopic study that permits the identification of bullets and cartridge cases as having been . . . fired by a particular firearm to the exclusion of any other firearm."

"[C]omparative microscopic matching" "consists of attempting to identify the 'toolmarks' impressed upon the bullet fragments and cartridge casings often recovered from a crime scene, in an effort to determine whether the toolmarks impressed upon the evidence could have been created by a firearm that has been connected to a suspect." *Fleming v. State*, 194 Md. App. 76, 101 (2010). "The random imperfections in the bore of the firearm are theoretically unique to each firearm, and 'the probability that another firearm would have identical bore imperfections is considered so remote that firearms

identification examiners often conclude that a bullet has been fired from a particular firearm and could not have been fired by any other firearm.'" *Id.* at 103 (quoting Paul C. Giannelli & Edward J. Imwinkelried, *Scientific Evidence* § 14.03 (4th ed. 2007)). "In making the inquiry into the similarity or near-identity of toolmarks, a trained firearm toolmark examiner uses a 'comparison microscope' to compare spent ammunition components recovered from a crime scene with ammunition components fired from the candidate firearm." *Id.* (citing *United States v. Monteiro*, 407 F. Supp. 2d 351, 359 (D. Mass. 2006)). "Ultimately, the determination of whether a potential 'match' exists is made by a trained examiner using a split-screen microscope to simultaneously compare the toolmarks on the crime scene evidence against the toolmarks produced by a test round fired by the subject firearm." *Id.* at 104 (citing *Monteiro*, 407 F. Supp. 2d at 355).

Citing recent studies and court decisions that allegedly reveal the limitations of drawing the unequivocal conclusions that Special Agent Williamson expressed, Patterson claims to have identified newly-discovered evidence, which could not have been discovered through the exercise of due diligence in time to file a motion for new trial under Md. Rule 4-331(c), but which creates a substantial possibility that, had this evidence been admitted during his 1993 trial, a different outcome would have resulted.

The circuit court conducted a hearing on Patterson's petition. In a written opinion, the court concluded that the evidence would not have substantially affected the jury's verdict. Accordingly, it denied the petition.

Patterson noted this timely appeal.

**DISCUSSION**

**I.**

A petition for writ of actual innocence, under Maryland Code (2001, 2008 Repl. Vol., 2015 Supp.), § 8-301 of the Criminal Procedure Article ("CP"), gives a convicted person "an opportunity to seek a new trial based on newly discovered evidence that speaks to his or her actual innocence[.]" *Douglas v. State*, 423 Md. 156, 176 (2011). Section 8-301 gives a person this opportunity by establishing the functional equivalent of a motion for new trial on the ground of newly-discovered evidence, but without the strict time limits imposed by Maryland Rule 4-331(c). *See Douglas*, 423 Md. at 176.[2] The statute provides in pertinent part:

> (a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
>
> (1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and
>
> (2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

CP § 8-301(a).

---

[2] Rule 4-331(c) authorizes the court to grant a new trial based on newly discovered evidence that could not have been discovered by due diligence in time to move for a new trial within 10 days after the verdict. Such a motion must be filed "within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post conviction relief[.]" Md. Rule 4-331(c)(1).

In brief summary, § 8-301(a) imposes three requirements upon a petitioner: (1) he or she must come forward with "newly discovered evidence"; which (2) "creates a substantial or significant possibility that the result [of his or her trial[3]] may have been different"; and which (3) "could not have been discovered in time to move for a new trial under Maryland Rule 4-331," a requirement known as "due diligence." If a petitioner substantially complies with the requirements of CP § 8-301(b) and Rule 4-332(d) and asserts grounds that could, if proven, entitle the petitioner to relief, then he or she is entitled to a hearing on that petition. CP § 8-301(e); Md. Rule 4-332(j)(1); *State v. Hunt*, 443 Md. 238, 250-51 (2015).

In a proceeding under CP § 8-301, the petitioner bears the burden of proof. CP § 8-301(g); Md. Rule 4-332(k). That burden stands in stark contrast to an appellant's burden in a direct appeal from a criminal conviction. If an appellant establishes error in a direct appeal from a criminal conviction, the burden shifts to the State to show "'that the error in no way influenced the verdict.'" *Dionas v. State*, 436 Md. 97, 108 (2013) (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)). By contrast, in a petition for a writ of actual innocence, the petitioner must show that "there [is] a substantial possibility that a different result would have occurred in the trial, whether jury or bench, as a result of the newly discovered evidence." *Yonga v. State*, 446 Md. 183, 208 (2016); *see* CP § 8-

---

[3] In *Yonga v. State*, 446 Md. 183 (2016), the Court of Appeals held that if a person is convicted after pleading guilty, he or she is ineligible to seek relief under the actual innocence statute.

301(a)(1) (petitioner must show "a substantial or significant possibility that the result may have been different").

Because the circuit court denied Patterson's petition on the merits after a hearing, we review the circuit court's decision to deny that petition for abuse of discretion. *Hunt*, 443 Md. at 247-48; *Snead v. State*, 224 Md. App. 99, 109 (2015). Under that standard, this Court "will not disturb the circuit court's ruling, unless it is 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable.'" *McGhie v. State*, 224 Md. App. 286, 298 (2015) ("*McGhie I*") (quoting *Jackson v. State*, 216 Md. App. 347, 363-64 (2014) (further quotation marks omitted)), *aff'd*, ___ Md. ___, 2016 WL 4470907 (Aug. 24, 2016) ("*McGhie II*").

## II.

Patterson contends that the circuit court abused its discretion in denying his petition because, he says, the State's expert in comparative microscopic matching, Special Agent Williamson, was erroneously permitted to testify that the .38 caliber revolver, recovered from him in Washington, D.C., fired the fatal shots "to the exclusion of any other firearm in the world." He points out that the State relied upon that testimony both in closing argument and rebuttal. On that basis, he concludes that the alleged error "contributed to the verdict."

In support of his claim of error, Patterson cites "recent scientific studies and the emerging scholarly literature and case law recognizing the limitations of firearms identification for making such emphatic and unequivocal conclusions." He relies upon

the following authorities: Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005); National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* (The National Academies Press 2009), available at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf (last visited Aug. 4, 2016); and Richard Gryzbowski, et al., *Firearms/Toolmark Identification: Passing the Reliability Test Under Federal and State Evidentiary Standards*, 35 AFTE J. 209 (2003); and several court decisions, including *United States v. Otero*, 849 F. Supp. 2d 425 (D.N.J. 2012); *United States v. Willock*, 696 F. Supp. 2d 536 (D. Md. 2010); *United States v. Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008); *United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006); *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005); and *People v. Robinson*, 2 N.E.3d 383 (Ill. App. Ct. 2013).[4]

Patterson contends that those studies, articles, and court decisions comprise newly-discovered evidence, which could not have been discovered through the exercise of due diligence in time to file a motion for new trial under Md. Rule 4-331(c), but which create

---

[4] The cited cases are not overwhelmingly helpful to Patterson. In *Willock*, 696 F. Supp. 2d at 571, Judge Paul Grimm found that the "theory of firearms-related toolmark identification" was "generally accepted within the field of toolmark examiners." In *Otero*, 849 F. Supp. 2d at 437-38, the court held that a toolmark identification opinion was admissible. In *Glynn*, 578 F. Supp. 2d at 574, the court expressed reservations about "ballistics examination," but concluded that the "methodology ha[d] garnered sufficient empirical support as to warrant its admissibility." In *Monteiro*, 407 F. Supp. 2d at 372, the court "conclude[d] that the methodology of firearms identification is sufficiently reliable." In *Green*, 405 F. Supp. 2d at 109, the court "reluctantly" admitted firearm toolmark evidence because of its "confidence" that the appellate court would reject a contrary decision.

a substantial possibility that, had this evidence been admitted during his 1993 trial, a different outcome would have resulted. In effect, he maintains that his 1993 convictions were based upon junk science.

### III.

We assume for the sake of argument that Patterson has identified newly-discovered evidence that could not have been discovered through the exercise of due diligence in time to file a motion for new trial under Md. Rule 4-331(c).[5] Even on that assumption, the circuit court did not abuse its discretion in concluding that Patterson had failed to discharge his burden of showing "a substantial possibility that a different result would have occurred in the trial . . . as a result of the newly discovered evidence." *Yonga*, 446 Md. at 208.

As recently as 2010, this Court confirmed that comparative microscopic matching is still generally accepted within the scientific community and is, for that reason, admissible under the *Frye-Reed* standard for evaluating the introduction of expert testimony. *See Fleming*, 194 Md. App. at 106-07. In upholding a first-degree murder conviction in that case, this Court observed that in *Reed v. State*, 283 Md. 374 (1978), the

---

[5] Although scientific studies unquestionably can qualify as newly-discovered evidence (*Ward v. State*, 221 Md. App. 146, 163 (2015)), some of the scientific information does not appear to be particularly new. As the State points out, one of Patterson's principal authorities cites a 1955 study. Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, *supra*, 6 Colum. Sci. & Tech. L. Rev. at 14. Another authority cites studies, published in 1959 and 1984, which questioned the statistical foundation underlying comparative microscopic matching. National Research Council of the National Academies, *Strengthening Forensic Science in the United States*, *supra*, at 154 n.63.

very case that adopted what we now know as the *Frye-Reed* standard, the Court of Appeals "referred to 'ballistics' as an example of a discipline for which 'the validity and reliability is so broadly and generally accepted' that . . . 'a trial court may take judicial notice of its reliability.'" *Fleming*, 194 Md. App. at 107 (quoting *Reed*, 283 Md. at 380). The discipline of "firearms toolmark identification" is widely (though incorrectly) known as "ballistics." *Id.* at 100 n.2.[6]

In *Fleming* we recognized that comparative microscopic matching or toolmark identification involves subjective judgments by the examiner. *Id.* at 104 (citing *United States v. Monteiro*, 407 F. Supp. 2d 351, 355 (D. Mass. 2006); Paul C. Giannelli & Edward J. Imwinkelried, *Scientific Evidence*, *supra*, § 14.03). We also recognized that some have criticized comparative microscopic matching because of "the inherent subjectivity of the examiner's ultimate determination." *Id.* at 105. Nonetheless, we concluded that the circuit court did not err in admitting expert testimony that used comparative microscopic matching, because it remains generally accepted within the scientific community. *Id.* at 109.[7]

---

[6] Firearms toolmark identification, which is "the practice of investigating whether a bullet, cartridge case or other ammunition component or fragment can be traced to a particular suspect weapon" (*Fleming*, 194 Md. App. at 100-01), does not directly involve ballistics, which is "'the study of the motion of a projectile[,]'" including the projectile's motion within the firearm and the projectile's effect on the target outside the firearm. *Id.* at 100 n.2 (quoting P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 14.01, at 707 (4th ed. 2007)).

[7] That conclusion was in the nature of a demi-holding: we had previously held that any error in admitting the testimony would have been harmless beyond a reasonable doubt because of the abundance of evidence that Fleming had fired the weapon in

If comparative microscopic matching is generally accepted within the scientific community even in 2016, it is inconceivable that the assorted criticisms, assembled by Patterson, would have resulted in a different outcome had he been able to present them at his initial trial in 1993. *Compare Ward v. State*, 221 Md. App. 146, 167-70 (2015) (vacating denial of a petition for writ of actual innocence, where newly-discovered evidence would have prevented expert from offering opinion based on discredited theory of CBLA). Unlike CBLA testimony, comparative microscopic matching is as admissible today as it was in 1993.

Patterson counters that, in light of his criticisms of comparative microscopic matching, a court would not have permitted Special Agent Williamson to express his opinions with absolute certainty, as he did at the 1993 trial. Yet, as the circuit court recognized in denying Patterson's petition for a writ of actual innocence, the agent would still have been permitted to testify, to a reasonable degree of certainty within his field of expertise, that the bullet that was found in the victim's body was shot out of the gun that Patterson attempted to discard just before his arrest in the District of Columbia. Hence, had the jury considered the "newly-discovered" evidence concerning toolmark identification, it might have assigned less weight to the agent's testimony, but most probably would not have discounted his testimony in its entirety. *Compare McGhie II*,

---

question. *Fleming*, 194 Md. App. at 99. That evidence included the testimony of three eyewitnesses, as well as the testimony of Fleming's step-grandfather, who linked Fleming to the weapon. *Id.* On the basis of that testimony, Fleming's counsel had conceded that Fleming fired the weapon; his sole defense had been that he did not intend to kill his victim.

___ Md. at ___, 2016 WL 4470907, at *9 (reasoning that there was a substantial or significant possibility that a jury might have discounted an expert's testimony "in its entirety" had it known that the expert had lied about his academic credentials).

In our view, the court was not "well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable" (*McGhie I*, 224 Md. App. at 298), when it was unpersuaded that the jury may have reached a different conclusion solely because of a semantic variation in the degree of certainty with which the FBI agent could have expressed his opinions. In light of the inculpatory testimony that the agent could properly have given, as well as the other evidence against Patterson, including the testimony of two eyewitnesses who placed him at or near the scene of the murder, the circuit court did not abuse its discretion in concluding that he had failed to discharge his burden. *See McGhie II*, ___ Md. at ___, 2016 WL 4470907, at *10; *McGhie I*, 224 Md. App. at 305-06.

In *McGhie* the petitioner came forward with newly-discovered evidence that the State's ballistics expert had lied about his qualifications. *See McGhie I*, 224 Md. App. at 293. The hearing judge nonetheless denied the petition, reasoning that, even without the ballistics evidence, there was "'ample testimony" from other witnesses that directly implicated the petitioner. *Id.* at 304 (quoting the circuit court). Both this Court and the Court of Appeals concluded that the circuit court did not abuse its discretion in concluding that the petitioner had not met his burden of showing that the newly-discovered evidence would have created a substantial or significant possibility of a different result. *See McGhie II*, ___ Md. at ___, 2016 WL 4470907, at *10 (no abuse of

discretion in denying actual innocence petition "given the weight of the evidence presented against [the petitioner] at trial"); *McGhie I*, 224 Md. App. at 305-06 (no abuse of discretion in denying petition where there was "other compelling evidence" of guilt). If it was not an abuse of discretion for a circuit court to conclude that an expert's lies failed to overcome other compelling evidence of guilt, then it could not be an abuse of discretion to conclude, as the circuit court did in this case, that an expert's undue emphasis on the certainty of his conclusions did not overcome the other compelling evidence of Patterson's guilt, including the inculpatory testimony that the expert could properly have given.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS ASSESSED TO APPELLANT.**